Sharre Lotfollahi
(SB 258913)
Kirkland & Ellis LLP
333 South Hope Street
29th Floor
Los Angeles, CA 90071
213-680-8400
sharre.lotfollahi@kirkland.com

Garret A. Leach (IL 6237520)
Megan M. New (IL 6300422)
Nikhil Krishnan
(SB 300616)
Kyle M. Kantarek (IL 6320889)
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
312-862-2000
garret.leach@kirkland.com
megan.new@kirkland.com
Nikhil.krishnan@kirkland.com
kyle.kantarek@kirkland.com

*Attorneys for Impact Engine, Inc.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPACT ENGINE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | CASE NO. 3:19-cv-01301-CAB-BGS<br><br>**SUPPLEMENTAL COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## SUPPLEMENTAL COMPLAINT

1.     Plaintiff Impact Engine, Inc. ("Impact Engine") is a technology company based in San Diego, California.  Impact Engine was founded to solve a systemic problem facing the online display advertising industry: how to create a unique, relevant ad experience for each ad viewer and each ad view without incurring massive costs in advertising production, delivery, internet bandwidth consumption, and content updates.

2.     Impact Engine's programmatic media-rich advertisement generation invention unlocked what was referred to internally as the "Impact Effect" (today identified by the advertising industry as "Programmatic Creative"). The "Impact Effect" simultaneously overcame multiple obstacles by making media-rich display advertising online an attractive product to buy for the advertiser, a relevant experience for the ad viewer, and one that conserved vital internet bandwidth resources. Realizing that its innovations were truly groundbreaking, Impact Engine sought and obtained patent protection.

3.     At the same time, Google LLC ("Google") was struggling to diversify its revenue base and began to realize that Impact Engine's ideas were integral to its future success. Over the course of two years, Google invited Impact Engine to multiple meetings at its Mountain View headquarters, required Impact Engine to provide prototypes, documentation, and source code, and falsely promised a cooperative partnership to bring Impact Engine's ideas to Google's larger platform.

4.     Rather than consummate a partnership, Google decided instead to copy Impact Engine's ideas and work product. Through its persistent, unlicensed use of Impact Engine's inventions, Google extracted billions of dollars in revenue from advertisers, website publishers, and advertising agencies. As a result of Google's brazen, willful infringement, Impact Engine has been forced to compete against its own technology.

5.     Google's actions left the dedicated and hard-working employees of Impact Engine with no options other than litigation. Impact Engine now brings this lawsuit to hold Google accountable for its willful patent infringement.

## NATURE OF THE CASE

6.     Impact Engine brings claims under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, for the willful infringement of multiple patents, which include U.S. Patent Nos. 7,870,497; 8,356,253; 8,930,832; 9,361,632; 9,805,393; 10,068,253; 10,565,618; and 10,572,898 ("Patents-in-Suit").

**PARTIES**

7.    Impact Engine is a Delaware company with a principal place of business at 11772 Sorrento Valley Rd. Ste. 170, San Diego, CA 92121.  All of Impact Engine's employees reside in San Diego, California.

8.    Defendant Google LLC ("Google") is a Delaware limited liability company with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

**JURISDICTION AND VENUE**

9.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

10.    The Court has personal jurisdiction over Google because it has, either directly or through intermediaries, conducted business in this District by shipping, distributing, offering for sale, selling, and advertising (including the provision of an interactive web page) their products and services in both the State of California and this District.  Google has, either directly or through intermediaries, purposefully and voluntarily placed one or more of their infringing products and/or services into the stream of commerce with the intention and expectation that they will be purchased and used by consumers in this District.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1400(b) because Google regularly conducts business within this District, has a regular and established place of business in this District, and has committed acts of infringement within this District. Google's regular and established place of business in this District is located at 6420 Sequence Dr., San Diego, CA 92121.  This office consists of nearly 60,000 square feet of office space and houses hundreds of workers.   Upon information and belief, these employees are working on hardware and software to further enable Programmatic Creative.

## BACKGROUND

12.     Impact Engine has invested tens of millions of dollars and almost two decades of work into innovations that have transformed the online advertising industry. Specifically, Impact Engine's patented technologies have significantly reduced operating costs for millions of advertisers, and have enabled online display advertising spending of hundreds of billions of dollars.  Impact Engine filed its first patent application on April 13, 2005 describing its revolutionary technology.  This technology enabled advertisers to reach each ad viewer with a media-rich advertisement containing messaging and content tailored to that individual.  Today, Impact Engine's breakthrough technology is what is known in the advertising industry as "Programmatic Creative."

13.     Impact Engine's co-founders and two of the three co-inventors of the Patents-in-Suit, Neil Greer (Chief Executive Officer) and Bryan Depew (Vice President of Product Development), have been crucial to Impact Engine's innovations and operations.  Neil and Bryan have been developing, releasing, and scaling product lines together since 2001.  To fund these innovations, Impact Engine engaged in highly successful sales and marketing, ran efficient internal operations, forwent capital distributions, and re-invested all revenues. Neil and Bryan's personal sacrifices and capital investments, along with those of their family and friends, enabled Impact Engine's research and development efforts.  Thanks to this ingenuity and sacrifice, Impact Engine was the first company to bring Programmatic Creative to the online advertising industry.

14.     Prior to meeting Impact Engine, Google was struggling to find a pathway to sustained growth beyond its Google.com search engine product.  The market openly questioned the long-term ability of "pay-per-click" text advertising revenue to support the already lofty stock price of a company whose only product was a search engine.

15.     In an attempt to provide scale to its revenues beyond pay-per-click text advertising, Google released AdSense, a network for connecting online display advertisers with website publishers looking to monetize unsold ad space on their websites.

16.     The advertising industry was unimpressed with AdSense and the poor performance of the ads it allowed.  AdSense frustrated the advertising industry (including advertisers, advertising agencies, designers, and website publishers) by restricting creativity and driving up the costs of doing business.  AdSense forced advertisers and designers to provide online display advertising in a rudimentary, static, image-based file format that could neither be edited nor updated by the AdSense platform.  AdSense was also unappealing to ad viewers as the ads lacked creativity, were generic, and quickly became outdated.  The low-quality ads generated through AdSense did not create an acceptable return for the advertiser and diminished the value of the website publisher's content.  This lack of return on investment, in turn, drove down the price advertisers would pay to place an ad.  As a result, advertisers, designers, and advertising agencies voiced widespread criticism of the limitations of the online display advertising capabilities of the AdSense platform.

17.     Unlike AdSense, Impact Engine's platform provided the industry's first Programmatic Creative solution.  The Impact Engine platform included tools for rapidly generating dynamic, media-rich advertisements.  Once generated, these dynamic ads could be broadcast to, and formatted for, ad viewers regardless of their viewing device.  Additionally, the ad content could be updated almost instantaneously even after the ads were live.  Google recognized its failing AdSense product needed Impact Engine's revolutionary platform and thus engaged in repeated and ongoing discussions with Impact Engine.

18.     Not only did Impact Engine bring programmatic, media-rich, device-agnostic, display advertising to the market, Impact Engine created a platform that allowed for an unlimited number of generated advertisements running on separate websites to be updated in a targeted and frequent manner.  This opened the revolutionary pathway for users to generate dynamic advertisements, advertisers to profit from their online display ad spending, and industry revenue from online display advertising to grow exponentially.

## INTERACTIONS WITH GOOGLE

19.     Recognizing the possibility of collaboration, in mid-2005 Impact Engine and Google connected.

20.     Immediately prior to Google and Impact Engine meeting, Megan Smith, then Google's Head of Corporate Development, expressed to Neil that she was considering the possibility of partnering with Impact Engine.  Neil sent Ms. Smith a marketing brief setting forth Impact Engine's history, state of company operations, vision of the role of Programmatic Creative in online communications, and a proposal for making that vision a reality.

21.     In the fall of 2005, Impact Engine first met with Google.  This meeting involved, *inter alia*, Neil, Bryan, and Ms. Smith.  This meeting took place at Google's headquarters in Mountain View, California.  Neil's presentation on Impact Engine's innovations left Ms. Smith impressed.  In fact, after the meeting ended, she took the Impact Engine team on a tour of the executive wing of Google headquarters and showed off other products including Google Earth.  As a result of this meeting, Ms. Smith put Neil in contact with one of Google's product group directors to explore Impact Engine's technology further.

22.     During the end of 2005 and throughout 2006, Impact Engine focused on making Programmatic Creative for display advertising online a reality.  The result was Flash Ad Engine.  This product was a first-of-its-kind offering that was rapidly adopted by advertisers and website publishers.  The hard-to-please designer community concurrently supported the product and helped spread the word of its arrival.  Business was thriving with a customer and prospect list of high-profile companies that quickly grew into the thousands across the United States and the world.

23.     Flash Ad Engine enabled small and large advertisers (and website publishers alike) to fully participate in the benefits of display advertising online.  Specifically, where Google AdSense only allowed advertisers access to low-impact, static, image-based ads,

Flash Ad Engine enabled advertisers and designers to access a platform for creating media rich ad experiences that were far more engaging to ad viewers.  Through the magic of the Impact Effect, generated by its Programmatic Creative invention, media-rich ads created with Flash Ad Engine loaded quickly on the screen and conserved vital internet bandwidth resources at the same time.  Further, Flash Ad Engine presented the experienced and non-technical designer alike with a suite of interactive functionalities that made building and generating media-rich advertisements as simple as "point-and-click."  Additionally, Impact Engine's company vision and product roadmap for its inventions was crafted with a broad, global vision that was not limited to ad designers.  It also included a multi-distribution platform with an interface that designers, ad agencies, ad networks, and website publishers could access and use to build their own templates and media assets, among a multitude of other features.

24.    In early 2007, after Impact Engine had garnered a nationwide customer base (in only 9 months since the launch of Flash Ad Engine), Google and Impact Engine reconnected.  Since the first meeting, AdSense had continued to underperform in the marketplace, and industry backlash was at its zenith.  Advertisers, ad agencies, and designers across the industry were demanding a more creative and expressive graphical ad building platform.  Fortunately, Impact Engine and its visionary team was there to meet their needs.  But Google needed to better understand the technological advancements Impact Engine had made in the Programmatic Creative space.  Google's executives were trailing the online display advertising marketplace and needed a partner to help them understand a viable, scalable path forward.  Under this mounting industry pressure, Google invited Impact Engine to disclose its approach to the market, the details of its product offerings, and its market experience.

25.    Again, Impact Engine and Ms. Smith spoke about the opportunity of a partnership.  This time, she scheduled a meeting between Neil and Jill Szuchmacher, Google's Principal of New Business Development.  Ms. Szuchmacher invited additional

Google personnel to the meeting as well.  The first 2007 meeting was held at Google headquarters.  The meeting involved an initial discussion of the display and video advertising challenges facing Google as well as Impact Engine's capabilities and its Programmatic Creative invention.  The discussion was lively and Google was eager to continue the relationship with Impact Engine.  After that initial meeting, Ms. Szuchmacher reached out to schedule a second meeting, again at Google headquarters, but this time with Google product development executives having senior decision-making capacity.

26.    Prior to this second meeting, Impact Engine sent multiple confidential memoranda to Ms. Szuchmacher presenting the successful and proprietary Flash Ad Engine.  By this time, Flash Ad Engine serviced a nationwide customer base of website publishers including privately owned newspapers, television and radio stations, and publicly traded media conglomerates.  The first memorandum, sent in February 2007, described Impact Engine's capabilities, market vision, and patent-pending innovations. This memorandum characterized the needs in the online display advertising field and detailed Impact Engine's approach to meeting those needs via Programmatic Creative advertising.  It described in detail how the Flash Ad Engine advertising platform functioned and how it achieved such swift adoption in the marketplace.  Further, it outlined Impact Engine's role as the originator and inventor of Programmatic Creative.

27.    As a condition to continuing discussions, Google required Impact Engine to develop a Google-specific prototype and share source code.  Ms. Szuchmacher instructed Neil on the specific deliverables required in advance of the second 2007 meeting, which together amounted to a significant development effort tailored specifically to Google.  The deliverables were required in six weeks' time.  Ms. Szuchmacher even acknowledged in writing that Google was highly interested in Impact Engine and was working toward a collaboration strategy to allow Impact Engine to improve Google's AdSense product and network.  In response, Impact Engine pooled all available resources and re-tasked all team

members to design and produce the working prototype that would revolutionize the Google advertising platform.

28.    It was a monumental task.  Neil put a halt on all new product and feature development, reprioritizing Impact Engine's new products and innovation team to develop a dynamic advertisement building platform specifically catered to Google.  By this time, Impact Engine had grown to a team of over 30 and had successfully launched two products in the advertising technology space.  Development of Impact Engine's confidential new platform product (dubbed "ImpactEngine.com"), the Company's largest effort to date, was put on hold.

29.    Google was applying extreme pressure on Impact Engine, treating Impact Engine as an extension of its organization.  Google was particularly interested in understanding the details behind Programmatic Creative, including data enabled video templates, keyword templates, and geo-location enabled templates.

30.    The materials and progress Google demanded in the short six-week period were extensive.  Further, Ms. Szuchmacher required fully coded ad templates and specifications for advertisement generation to be completed two weeks early.  Ms. Szuchmacher told Neil that she wanted this information to fast-track the meeting.  To do so, she needed executives she called "Key Product Decision Makers" to be on board and to review Impact Engine's work product in advance of the meeting.

31.    As requested, Impact Engine provided Google with the requested work product in four weeks.  This work product included a second memorandum containing in-depth disclosures, creative samples, source code, and production documents.

32.    To complete all required deliverables, Impact Engine's entire development team was required to grind away in a six-week "sprint" to complete the work product in accordance with Google's specifications.  And Impact Engine met the deadline.  To do so, Impact Engine's development team collectively labored for over two thousand hours. Google paid nothing for this work.

33.     The cash and opportunity cost for Impact Engine to put its own product development efforts on hold was substantial.  The "ImpactEngine.com" product was an industry-first hosted Programmatic Creative advertising platform where dynamic, media-rich advertisements could be generated on the fly.  In this system, an advertiser could create a single ad campaign that could yield an unlimited number of custom variations.  Millions of display ads could easily be deployed and edited while running live on each ad viewer's screen without having to be completely re-fabricated or taken down for editing.   An additional benefit was that the advertisements could be easily broadcast, regardless of the display configurations of the receiving device, and rapidly rendered on mobile devices and desktop computers alike in a visually appealing, relevant form.  This contrasted greatly with Google's existing AdSense platform, where the only transmittable file was static and had to be fully downloaded and rendered to be viewed on each and every website, from scratch, for each ad viewer; an incredibly restrictive and resource-intensive undertaking.

34.     Through its in-development "ImpactEngine.com" product, Impact Engine had created the industry's first programmatic creative advertisement generation system with rapid editing on a global scale for use by advertisers, designers, ad agencies, and website publishers with accessibility to technically and non-technically adept users alike.

35.     The final meeting with Google took place in April 2007, during which Neil presented a real-time demonstration of a working model to Ms. Szuchmacher and the Key Product Decision Makers.  Upon viewing this presentation, Google appeared awestruck.

36.     The two senior Key Product Decision Makers at the meeting were part of Google's new product development team. These individuals were believed to be tasked with identifying new areas of opportunity and implementing products of high strategic importance, including what would eventually be called the Google Display Ad Builder. Neil walked them through the key features of the system.  He showed them how to use the graphical interface, where the code was, how the code integrated the data calls into the advertisement, how the advertisement was sent out to the publisher website and how it was

broadcast on the edge.  The deeper Neil went into describing Impact Engine's proprietary technology, the more these two Key Product Decision Makers seemed to become uncomfortable.  In the middle of this presentation, the two senior Key Product Decision Makers abruptly left the room.  The meeting was over.

37.    Impact Engine later followed up multiple times in an attempt to continue the relationship, but was left in the dark.

38.    Eighteen months after this April 2007 meeting, Google released the first iteration of its competing product, dubbed "Display Ad Builder."

39.    Despite the fact that Display Ad Builder was based upon the work product Impact Engine had provided confidentially and with various intellectual property protections, Google released this product as its own.  The news of this release and its impact on Google's revenue was proudly posted online.  In the months following this release, and repeatedly thereafter, Google passed off Impact Engine's invention as something it had invented anew and touted the product's exportation overseas to over 100 countries.

40.    In a May 12, 2009 blog post (still residing online at https://adsense.googleblog.com/2009/05/what-display-ad-builder-means-for.html), Google states that:

> "Since its launch, the Display Ad Builder has been extended to advertisers in over 100 countries and 40 languages.  With over 90 customizable templates and thousands of active users of all sizes, the Display Ad Builder has quickly become what we believe is the largest platform for self-serve display ad creation on the web. Its usage varies from the largest digital agency, like Razorfish, to smaller advertisers like the Wilshire Grand Los Angeles.  We'd like to take a few minutes to tell you more about the impact of this tool and how it can benefit you as a publisher:
>
> **More advertisers creating display ads:**  In just six months, the Display Ad Builder has significantly increased the number of AdWords advertisers using image-based ads.  Many of these advertisers were already advertising with text ads on Google.com

11

and AdSense sites, but have now found the visual elements, interactivity, and animations of display ads to be effective at increasing clicks, conversions, and overall ROI.

**Higher quality, more relevant display ads for your site:** With simplified display ad creation now available to advertisers of all sizes and industries, the display ads that show on your site are likely to be even more relevant to your content and audience.  For sites with niche content or with an advertiser base that would be less likely to have the budgets to invest in display ad creation, this is especially true.  The templates that we offer also vary well beyond simple static banners, including interactive rich media templates that allow users to scroll between or roll over multiple product images, in addition to multiple templates with animated text and images.

**Higher potential earnings:** As the reach of ads created with Display Ad Builder grows, we've seen encouraging results -- ads created with the Display Ad Builder have average click-through rates that outperform industry averages.  We believe that this is due to the combination of advanced contextual targeting on AdSense, combined with templates that encourage best practices in effective display ad creation.  We've also heard from many advertisers that they're finding improved cost per conversion efficiencies with the tool, meaning that more of their marketing budgets can be effectively deployed online, on your sites."

41.    What Google blatantly disregarded, and what Neil emphasized prior to and during the meetings, was that on April 13, 2005, Impact Engine filed U.S. provisional application No. 60/671,170, which eventually issued as the first of the Patents-in-Suit discussed below.

42.    With the release of Google's first iteration of the accused products, Google began offering Impact Engine's patented systems and methods to the public.  Impact Engine could not compete with Google's infringing systems and methods.

43.     It was one of Impact Engine's express, written goals to re-invest capital from the success of its inventions.   These goals included expand operations at its San Diego headquarters and globally, create thousands of jobs, offer the company's shares on the NASDAQ, and deliver significant economic impact to communities in the surrounding region.  Google, under the false pretense of a trusting partnership, took Impact Engine's intellectual property and products.  Google's brazen, willful infringement has deprived the promising company of its ability to achieve this goal.

44.     Over the past decade, Impact Engine has continued to serve publishers in the newspaper, television, and radio industries throughout the United States, including such well-known media brands as the San Diego Union Tribune and 91x.

## THE PATENTS-IN-SUIT

45.     On January 11, 2011, the United States Patent and Trademark Office ("PTO") duly and legally issued U.S. Patent No. 7,870,497 (the "'497 patent"), entitled "Multimedia Communication System and Method."  A true and accurate copy of the '497 patent is attached hereto as Ex. 1.

46.     On January 15, 2013, the PTO duly and legally issued U.S. Patent No. 8,356,253 (the "'6,253 patent"), entitled "Multimedia Communication System and Method."  A true and accurate copy of the '6,253 patent is attached hereto as Ex. 2.

47.     On January 6, 2015, the PTO duly and legally issued U.S. Patent No. 8,930,832 (the "'832 patent"), entitled "Multimedia Communication System and Method." A true and accurate copy of the '832 patent is attached hereto as Ex. 3.

48.     On June 7, 2016, the PTO duly and legally issued U.S. Patent No. 9,361,632 (the "'632 patent"), entitled "Multimedia Communication System and Method."  A true and accurate copy of the '632 patent is attached hereto as Ex. 4.

49.     On October 31, 2017, the PTO duly and legally issued U.S. Patent No. 9,805,393 (the "'393 patent"), entitled "Multimedia Communication System and Method." A true and accurate copy of the '393 patent is attached hereto as Ex. 5.

50.     On September 4, 2018, the PTO duly and legally issued U.S. Patent No. 10,068,253 (the "'8,253 patent"), entitled "Multimedia Communication System and Method."  A true and accurate copy of the '8,253 patent is attached hereto as Ex. 6.

51.     On February 18, 2020, the PTO duly and legally issued U.S. Patent No. 10,565,618 (the "'618 patent"), entitled "Multimedia Communication System and Method."  A true and accurate copy of the '618 patent is attached hereto as Ex. 13.

52.     On February 25, 2020, the PTO duly and legally issued U.S. Patent No. 10,572,898 (the "'898 patent"), entitled "Multimedia Communication System and Method."  A true and accurate copy of the '898 patent is attached hereto as Ex. 14.

## IMPACT ENGINE'S INNOVATIONS AND PATENTS

53.     Prior to the inventions described in the patents-in-suit, display advertisements were created from scratch each time for each and every ad version and size variation. In practice and efficacy, online display ads were no different than print display ads. Advertising content in the online display ads was static.  Specifically, each display ad needed to be rendered and downloaded in its entirety for each ad viewer and each visit to the website.  This created an excessive use of available internet bandwidth and degraded the ad viewer experience at the website.  Further, there was no economically viable ability to tailor the display ad to the preferences of an individual ad viewer.  The end result was that display ad campaigns quickly became irrelevant and their return on investment was often low or negative.  Due to the time and expense in creating these ads, these campaigns were dreaded by both advertisers and ad viewers alike.

54.     Prior to Impact Engine's innovations, "development of a communication piece such as a presentation, banner advertisement, website or brochure, whether static or dynamically employing multimedia, [was] usually contracted out to a professional graphic designer. Such professional [was] typically part of a professional agency, such as an advertisement agency, which [were] usually cost-prohibitive for small enterprises (i.e. sole proprietor or small business), and [could] be unnecessarily costly for larger enterprises.

These agents or agencies consume large amounts of resources, in time and/or money particularly, for creating a media-rich communication, such as a website, an e-mail campaign, a banner advertisement, or other communication. Accordingly, a system and method which automates the process of creating and distributing professional quality, media rich communications [was] needed." ('497 Patent at 1:12-26).

55.     The Patents-in-Suit describe and claim revolutionary systems and methods for easily creating display ads that can be modified frequently and broadcast without extensive use of internet bandwidth resources.  These modifications can be based on inputs from users and distributed to the viewing audience.  These advertisements can be modified by users without having to stop the ad campaign or take down the ad to make updates.  In revolutionary fashion, these modifications appear in the ads within a short period of time. With the benefit of these systems and methods, advertising communication templates are available to receive inputs from data sources (*e.g.*, keywords and data) and be customized with media-rich assets (*e.g.*, words, images, and videos) to create an advertisement uniquely tailored to each ad viewer in a format compatible with whatever device the ad viewer happens to be on.

56.     The Patents-in-Suit specifically include claims to a database and a server, which server includes discrete processing elements that are specifically programmed to carry out the functions recited in the claims.  As such, the claimed invention is directed to specific and novel systems or methods including machines configured for specific purposes that implement discrete processes for generating and broadcasting online advertisements. The claims are directed toward novel improvements in the functioning of a technological system (*e.g.*, a server-side online advertisement generation system).  This server-side functionality was not practiced at the time of the applicant's filing.  Instead, display advertisements at that time were generated only with extensive manual effort and the involvement of multiple individuals.  Advertisements were constructed by a user, usually one or several highly specialized designers working in the advertising industry with a cross

functional background in computer science and multimedia arts, who assembled the display advertisement from scratch based only on known, identified, and campaign-specific data for only that one ad and its size variations.  As such, the usefulness of these display advertisements was limited by the particular campaign and moment in time for which they were built.  These advertisements were not dynamic and were very difficult to re-utilize.  Once compiled, these advertisements represented the sole collection of available advertisements that could be sent to potential ad viewers and the entire viewing audience received the same display ad without regard to their unique characteristics and preferences.  After the campaign had run its course, or the advertisements needed to be changed, the whole process would have to be repeated from scratch.

57.     The Patents-in-Suit claim dynamic advertisement generation that is ad viewer specific such that content can change often based on each ad viewers' evolving preferences, rather than one ad made for every ad viewer.  Moreover, even though they may be relatively ubiquitous now, the recited project builder and/or project viewer used for the building of the claimed advertisements were not routine computer functionalities.  The inventions claimed in the Patents-in-Suit made a design career specializing in creating and managing exciting media-rich display advertisements available to a much wider workforce population, in turn creating new jobs.  The phenomenon created by Impact Engine's inventions also freed up high-priced, cross-functional designers to work on more suitable assignments, some in furtherance of industry innovation.  And the "Impact Effect" of simultaneous, radical operational cost reduction, optimized utilization of workforce resources, and, most importantly, satisfied ad viewers was, and is still, widely felt by advertisers, designers, website publishers, and ad agencies here in the United States and worldwide.    Accordingly, the claims of the Patents-in-Suit embody an improvement to the claimed computer-implemented process that is both palpable and functional.

## ACCUSED PRODUCTS

58.     Google provides and has provided many products and services that infringe the Patents-in-Suit, including through the use thereof.  The Accused Products in this case include Google Ads, Google AdWords, Google Display Ad Builder, Google AdSense, Google Doubleclick, Google Marketing Platform, Google Web Designer, Google Display Network, as well as any other iterations of these products (collectively the "Accused Products").

## FIRST CAUSE OF ACTION

### Infringement of the '497 Patent by Google

59.     Impact Engine realleges and incorporates each of the allegations above as though fully set forth herein.

60.     Google's products and/or services that infringe the '497 Patent include, but are not limited to, the Accused Products and use thereof.

61.     Google makes, uses, sells, offers for sale, and/or imports the Accused Products and components thereof in the United States.

62.     Google directly infringes — literally and/or under the doctrine of equivalents — at least the claims set forth in Ex. 7 attached to this complaint by making, using, selling, offering for sale, and/or importing into the United States its Accused Products and components thereof and exporting out of the United States its Accused Products and components thereof.  *See e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 138 S.Ct. 2129 (2018).

63.     Google has been aware of the patent application that issued as the '497 Patent since at least 2006.  Further, Google has been aware of the '497 Patent since it issued on January 11, 2011.

64.     Google knowingly induces infringement of the '497 Patent, including at least the claims set forth in Ex. 7 by customers and end-users of the Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that

its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and distribution of the Accused Products in the United States and abroad.  As such, Google has violated 35 U.S.C. § 271(b).

65.    Google contributes to infringement of the '497 Patent, including at least the claims set forth in Ex. 7, as provided in 35 U.S.C. § 271(c) by offering to sell, selling, importing into the United States, or exporting out of the United States one or more components that are a material part of the claimed inventions of the '497 Patent and that have no substantial non-infringing use with knowledge that such components are especially made or adapted for use in infringing the '497 Patent.  Such sold, offered for sale, imported, and/or exported components include the Accused Products and components thereof.

66.    Google's infringement of the '497 Patent is without license or other authorization.

67.    Because Google had knowledge of the '497 Patent rights and proceeded to directly and indirectly infringe, Google's infringement is willful.

68.    Google's continued infringement of the '497 Patent has damaged and will continue to damage Impact Engine in the amount to be proven at trial.

69.    Unless and until enjoined by this Court, Google will continue to directly infringe as well as induce and contribute to infringement of the '497 Patent.  Google's infringing acts are causing and will continue to cause Impact Engine irreparable harm, for which there is no adequate remedy at law.  Under 35 U.S.C. § 283, Impact Engine is entitled to a permanent injunction against further infringement.

### SECOND CAUSE OF ACTION

### Infringement of the '6,253 Patent by Google

70.    Impact Engine realleges and incorporates each of the allegations above as though fully set forth herein.

71.    Google's products and/or services that infringe the '6,253 Patent include, but are not limited to, the Accused Products and use thereof.

72.     Google makes, uses, sells, offers for sale, and/or imports the Accused Products and components thereof in the United States.

73.     Google directly infringes — literally and/or under the doctrine of equivalents — at least the claims set forth in Ex. 8 attached to this complaint by making, using, selling, offering for sale, and/or importing into the United States its Accused Products and components thereof and exporting out of the United States its Accused Products and components thereof.  *See e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 138 S.Ct. 2129 (2018).

74.     Google has been aware of the patent application that issued as the '497 Patent since at least 2006.  Further, Google has been aware of the '497 Patent since it issued on January 11, 2011.  The '6,253 Patent is a continuation of the '497 Patent.  Upon information and belief, Google has been aware of the patent application that issued as the '6,253 Patent since it was filed on January 11, 2011.  Further, Google has been aware of the '6,253 Patent since it issued on January 15, 2013.

75.     Google knowingly induces infringement of the '6,253 Patent, including at least the claims set forth in Ex. 8 by customers and end-users of the Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and distribution of the Accused Products in the United States and abroad.  As such, Google has violated 35 U.S.C. § 271(b).

76.     Google contributes to infringement of the '6,253 Patent, including at least the claims set forth in Ex. 8, as provided in 35 U.S.C. § 271(c) by offering to sell, selling, importing into the United States, or exporting out of the United States one or more components that are a material part of the claimed inventions of the '6,253 Patent and that have no substantial non-infringing use with knowledge that such components are especially made or adapted for use in infringing the '6,253 Patent.  Such sold, offered for sale,

imported, and/or exported components include the Accused Products and components thereof.

77.     Google's infringement of the '6,253 Patent is without license or other authorization.

78.     Because Google had knowledge of the '6,253 Patent rights and proceeded to directly and indirectly infringe, Google's infringement is willful.

79.     Google's continued infringement of the '6,253 Patent has damaged and will continue to damage Impact Engine in the amount to be proven at trial.

80.     Unless and until enjoined by this Court, Google will continue to directly infringe as well as induce and contribute to infringement of the '6,253 Patent.  Google's infringing acts are causing and will continue to cause Impact Engine irreparable harm, for which there is no adequate remedy at law.  Under 35 U.S.C. § 283, Impact Engine is entitled to a permanent injunction against further infringement.

## THIRD CAUSE OF ACTION

### Infringement of the '832 Patent by Google

81.     Impact Engine realleges and incorporates each of the allegations above as though fully set forth herein.

82.     Google's products and/or services that infringe the '832 Patent include, but are not limited to, the Accused Products and use thereof.

83.     Google makes, uses, sells, offers for sale, and/or imports the Accused Products and components thereof in the United States.

84.     Google directly infringes — literally and/or under the doctrine of equivalents — at least the claims set forth in Ex. 9 attached to this complaint by making, using, selling, offering for sale, and/or importing into the United States its Accused Products and components thereof and exporting out of the United States its Accused Products and components thereof.  *See e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 138 S.Ct. 2129 (2018).

85.     Google has been aware of the patent application that issued as the '497 Patent since at least 2006.  Further, Google has been aware of the '497 Patent since it issued on January 11, 2011.  The '832 Patent is a continuation of the '497 Patent.  Upon information and belief, Google has been aware of the patent application that issued as the '832 Patent since it was filed on January 14, 2013.  Further, Google has been aware of the '832 Patent since it issued on January 15, 2015.

86.     Google knowingly induces infringement of the '832 Patent, including at least the claims set forth in Ex. 9 by customers and end-users of the Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and distribution of the Accused Products in the United States and abroad.  As such, Google has violated 35 U.S.C. § 271(b).

87.     Google contributes to infringement of the '832 Patent, including at least the claims set forth in Ex. 9, as provided in 35 U.S.C. § 271(c) by offering to sell, selling, importing into the United States, or exporting out of the United States one or more components that are a material part of the claimed inventions of the '832 Patent and that have no substantial non-infringing use with knowledge that such components are especially made or adapted for use in infringing the '832 Patent.  Such sold, offered for sale, imported, and/or exported components include the Accused Products and components thereof.

88.     Google's infringement of the '832 Patent is without license or other authorization.

89.     Because Google had knowledge of the '832 Patent rights and proceeded to directly and indirectly infringe, Google's infringement is willful.

90.     Google's continued infringement of the '832 Patent has damaged and will continue to damage Impact Engine in the amount to be proven at trial.

91.     Unless and until enjoined by this Court, Google will continue to directly infringe as well as induce and contribute to infringement of the '832 Patent.  Google's

infringing acts are causing and will continue to cause Impact Engine irreparable harm, for which there is no adequate remedy at law.  Under 35 U.S.C. § 283, Impact Engine is entitled to a permanent injunction against further infringement.

## FOURTH CAUSE OF ACTION

### Infringement of the '632 Patent by Google

92.   Impact Engine realleges and incorporates each of the allegations above as though fully set forth herein.

93.   Google's products and/or services that infringe the '632 Patent include, but are not limited to, the Accused Products and use thereof.

94.   Google makes, uses, sells, offers for sale, and/or imports the Accused Products and components thereof in the United States.

95.   Google directly infringes — literally and/or under the doctrine of equivalents — at least the claims set forth in Ex. 10 attached to this complaint by making, using, selling, offering for sale, and/or importing into the United States its Accused Products and components thereof and exporting out of the United States its Accused Products and components thereof.  *See e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 138 S.Ct. 2129 (2018).

96.   Google has been aware of the patent application that issued as the '497 Patent since at least 2006.  Further, Google has been aware of the '497 Patent since it issued on January 11, 2011.  The '632 Patent is a continuation of the '497 Patent.  Upon information and belief, Google has been aware of the patent application that issued as the '632 Patent since it was filed on January 6, 2015.  Further, Google has been aware of the '632 Patent since it issued on June 7, 2016.

97.   Google knowingly induces infringement of the '632 Patent, including at least the claims set forth in Ex. 10 by customers and end-users of the Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising,

promotion, support, and distribution of the Accused Products in the United States and abroad. As such, Google has violated 35 U.S.C. § 271(b).

98.     Google contributes to infringement of the '632 Patent, including at least the claims set forth in Ex. 10, as provided in 35 U.S.C. § 271(c) by offering to sell, selling, importing into the United States, or exporting out of the United States one or more components that are a material part of the claimed inventions of the '632 Patent and that have no substantial non-infringing use with knowledge that such components are especially made or adapted for use in infringing the '632 Patent. Such sold, offered for sale, imported, and/or exported components include the Accused Products and components thereof.

99.     Google's infringement of the '632 Patent is without license or other authorization.

100.    Because Google had knowledge of the '632 Patent rights and proceeded to directly and indirectly infringe, Google's infringement is willful.

101.    Google's continued infringement of the '632 Patent has damaged and will continue to damage Impact Engine in the amount to be proven at trial.

102.    Unless and until enjoined by this Court, Google will continue to directly infringe as well as induce and contribute to infringement of the '632 Patent. Google's infringing acts are causing and will continue to cause Impact Engine irreparable harm, for which there is no adequate remedy at law. Under 35 U.S.C. § 283, Impact Engine is entitled to a permanent injunction against further infringement.

## FIFTH CAUSE OF ACTION

### Infringement of the '393 Patent by Google

103.    Impact Engine realleges and incorporates each of the allegations above as though fully set forth herein.

104.    Google's products and/or services that infringe the '393 Patent include, but are not limited to, the Accused Products and use thereof.

105.   Google makes, uses, sells, offers for sale, and/or imports the Accused Products and components thereof in the United States.

106.   Google directly infringes — literally and/or under the doctrine of equivalents — at least the claims set forth in Ex. 11 attached to this complaint by making, using, selling, offering for sale, and/or importing into the United States its Accused Products and components thereof and exporting out of the United States its Accused Products and components thereof.  *See e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 138 S.Ct. 2129 (2018).

107.   Google has been aware of the patent application that issued as the '497 Patent since at least 2006.  Further, Google has been aware of the '497 Patent since it issued on January 11, 2011.  The '393 Patent is a continuation of the '497 Patent.  Upon information and belief, Google has been aware of the patent application that issued as the '393 Patent since it was filed on June 6, 2016.  Further, Google has been aware of the '393 Patent since it issued on October 31, 2017.

108.   Google knowingly induces infringement of the '393 Patent, including at least the claims set forth in Ex. 11 by customers and end-users of the Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and distribution of the Accused Products in the United States and abroad.  As such, Google has violated 35 U.S.C. § 271(b).

109.   Google contributes to infringement of the '393 Patent, including at least the claims set forth in Ex. 11, as provided in 35 U.S.C. § 271(c) by offering to sell, selling, importing into the United States, or exporting out of the United States one or more components that are a material part of the claimed inventions of the '393 Patent and that have no substantial non-infringing use with knowledge that such components are especially made or adapted for use in infringing the '393 Patent.  Such sold, offered for sale, imported, and/or exported components include the Accused Products and components thereof.

110.   Google's infringement of the '393 Patent is without license or other authorization.

111.   Because Google had knowledge of the '393 Patent rights and proceeded to directly and indirectly infringe, Google's infringement is willful.

112.   Google's continued infringement of the '393 Patent has damaged and will continue to damage Impact Engine in the amount to be proven at trial.

113.   Unless and until enjoined by this Court, Google will continue to directly infringe as well as induce and contribute to infringement of the '393 Patent.  Google's infringing acts are causing and will continue to cause Impact Engine irreparable harm, for which there is no adequate remedy at law.  Under 35 U.S.C. § 283, Impact Engine is entitled to a permanent injunction against further infringement.

## SIXTH CAUSE OF ACTION

### Infringement of the '8,253 Patent by Google

114.   Impact Engine realleges and incorporates each of the allegations above as though fully set forth herein.

115.   Google's products and/or services that infringe the '8,253 Patent include, but are not limited to, the Accused Products and use thereof.

116.   Google makes, uses, sells, offers for sale, and/or imports the Accused Products and components thereof in the United States.

117.   Google directly infringes — literally and/or under the doctrine of equivalents — at least the claims set forth in Ex. 12 attached to this complaint by making, using, selling, offering for sale, and/or importing into the United States its Accused Products and components thereof and exporting out of the United States its Accused Products and components thereof.  *See e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 138 S.Ct. 2129 (2018).

118.   Google has been aware of the patent application that issued as the '497 Patent since at least 2006.  Further, Google has been aware of the '497 Patent since it issued on

January 11, 2011.  The '8,253 Patent is a continuation of the '497 Patent.  Upon information and belief, Google has been aware of the patent application that issued as the '8,253 Patent since it was filed on October 26, 2017.  Further, Google has been aware of the '8,253 Patent since it issued on September 4, 2018.

119.   Google knowingly induces infringement of the '8,253 Patent, including at least the claims set forth in Ex. 12 by customers and end-users of the Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and distribution of the Accused Products in the United States and abroad.  As such, Google has violated 35 U.S.C. § 271(b).

120.   Google contributes to infringement of the '8,253 Patent, including at least the claims set forth in Ex. 12, as provided in 35 U.S.C. § 271(c) by offering to sell, selling, importing into the United States, or exporting out of the United States one or more components that are a material part of the claimed inventions of the '8,253 Patent and that have no substantial non-infringing use with knowledge that such components are especially made or adapted for use in infringing the '8,253 Patent.  Such sold, offered for sale, imported, and/or exported components include the Accused Products and components thereof.

121.   Google's infringement of the '8,253 Patent is without license or other authorization.

122.   Because Google had knowledge of the '8,253 Patent rights and proceeded to directly and indirectly infringe, Google's infringement is willful.

123.   Google's continued infringement of the '8,253 Patent has damaged and will continue to damage Impact Engine in the amount to be proven at trial.

124.   Unless and until enjoined by this Court, Google will continue to directly infringe as well as induce and contribute to infringement of the '8,253 Patent.  Google's infringing acts are causing and will continue to cause Impact Engine irreparable harm, for

which there is no adequate remedy at law.  Under 35 U.S.C. § 283, Impact Engine is entitled to a permanent injunction against further infringement.

## SEVENTH CAUSE OF ACTION

### Infringement of the '618 Patent by Google

125.   Impact Engine realleges and incorporates each of the allegations above as though fully set forth herein.

126.   Google's products and/or services that infringe the '618 Patent include, but are not limited to, the Accused Products and use thereof.

127.   Google makes, uses, sells, offers for sale, and/or imports the Accused Products and components thereof in the United States.

128.   Google directly infringes — literally and/or under the doctrine of equivalents — at least the claims set forth in Ex. 15 attached to this complaint by making, using, selling, offering for sale, and/or importing into the United States its Accused Products and components thereof and exporting out of the United States its Accused Products and components thereof.  *See e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 138 S.Ct. 2129 (2018).

129.   Google has been aware of the patent application that issued as the '497 Patent since at least 2006.  Further, Google has been aware of the '497 Patent since it issued on January 11, 2011.  The '618 Patent is a continuation of the '497 Patent.  Google has been aware of the '618 Patent since at least February 26, 2020, when Impact Engine provided notice to Google of its issuance during the Court's Early Neutral Case Evaluation proceeding.

130.   Google knowingly induces infringement of the '618 Patent, including at least the claims set forth in Ex. 15 by customers and end-users of the Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising,

promotion, support, and distribution of the Accused Products in the United States and abroad. As such, Google has violated 35 U.S.C. § 271(b).

131. Google contributes to infringement of the '618 Patent, including at least the claims set forth in Ex. 12, as provided in 35 U.S.C. § 271(c) by offering to sell, selling, importing into the United States, or exporting out of the United States one or more components that are a material part of the claimed inventions of the '618 Patent and that have no substantial non-infringing use with knowledge that such components are especially made or adapted for use in infringing the '618 Patent. Such sold, offered for sale, imported, and/or exported components include the Accused Products and components thereof.

132. Google's infringement of the '618 Patent is without license or other authorization.

133. Because Google had knowledge of the '618 Patent rights and proceeded to directly and indirectly infringe, Google's infringement is willful.

134. Google's continued infringement of the '618 Patent has damaged and will continue to damage Impact Engine in the amount to be proven at trial.

135. Unless and until enjoined by this Court, Google will continue to directly infringe as well as induce and contribute to infringement of the '618 Patent. Google's infringing acts are causing and will continue to cause Impact Engine irreparable harm, for which there is no adequate remedy at law. Under 35 U.S.C. § 283, Impact Engine is entitled to a permanent injunction against further infringement.

## EIGHT CAUSE OF ACTION

### Infringement of the '898 Patent by Google

136. Impact Engine realleges and incorporates each of the allegations above as though fully set forth herein.

137. Google's products and/or services that infringe the '898 Patent include, but are not limited to, the Accused Products and use thereof.

138.   Google makes, uses, sells, offers for sale, and/or imports the Accused Products and components thereof in the United States.

139.   Google directly infringes — literally and/or under the doctrine of equivalents — at least the claims set forth in Ex. 15 attached to this complaint by making, using, selling, offering for sale, and/or importing into the United States its Accused Products and components thereof and exporting out of the United States its Accused Products and components thereof.  *See e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 138 S.Ct. 2129 (2018).

140.   Google has been aware of the patent application that issued as the '497 Patent since at least 2006.  Further, Google has been aware of the '497 Patent since it issued on January 11, 2011.  The '898 Patent is a continuation of the '497 Patent.  Google has been aware of the '898 Patent since at least February 26, 2020, when Impact Engine provided notice to Google of its issuance during the Court's Early Neutral Case Evaluation proceeding.

141.   Google knowingly induces infringement of the '898 Patent, including at least the claims set forth in Ex. 15 by customers and end-users of the Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and distribution of the Accused Products in the United States and abroad.  As such, Google has violated 35 U.S.C. § 271(b).

142.   Google contributes to infringement of the '898 Patent, including at least the claims set forth in Ex. 12, as provided in 35 U.S.C. § 271(c) by offering to sell, selling, importing into the United States, or exporting out of the United States one or more components that are a material part of the claimed inventions of the '898 Patent and that have no substantial non-infringing use with knowledge that such components are especially made or adapted for use in infringing the '898 Patent.  Such sold, offered for sale, imported, and/or exported components include the Accused Products and components thereof.

143.   Google's infringement of the '898 Patent is without license or other authorization.

144.   Because Google had knowledge of the '898 Patent rights and proceeded to directly and indirectly infringe, Google's infringement is willful.

145.   Google's continued infringement of the '898 Patent has damaged and will continue to damage Impact Engine in the amount to be proven at trial.

146.   Unless and until enjoined by this Court, Google will continue to directly infringe as well as induce and contribute to infringement of the '898 Patent.  Google's infringing acts are causing and will continue to cause Impact Engine irreparable harm, for which there is no adequate remedy at law.  Under 35 U.S.C. § 283, Impact Engine is entitled to a permanent injunction against further infringement.

## **DEMAND FOR JURY TRIAL**

147.   Impact Engine respectfully requests a jury trial on any issues so triable by right.

## **PRAYER FOR RELIEF**

148.   WHEREFORE, Impact Engine respectfully requests that this Court enter judgment in its favor and grant the following relief:

A. A judgment that Google directly infringes and induces and contributes to the infringement of the Patents-in-Suit;

B. A judgment and order requiring Google to pay Impact Engine damages in an amount adequate to compensate Impact Engine for Google's infringement of the Patents-in-Suit, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

C. A judgment that Google's infringement of the Patents-in-Suit was and continues to be willful;

D. A judgment and order requiring Google to pay Impact Engine the prejudgment and post-judgment interest to the fullest extent allowed under the law, as well as its costs;

E. A permanent injunction enjoining Google, and all others in active concert with Google, from infringement of the Patents-in-Suit;

F. An order finding that this is an exceptional case and awarding Impact Engine its reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

G. Such other relief as the Court may deem appropriate and just under the circumstances.

Dated: March 4, 2019

Respectfully submitted,

*s/* Garret A. Leach

Sharre Lotfollahi (SB 258913)
KIRKLAND & ELLIS LLP
333 South Hope Street
29th Floor
Los Angeles, CA 90071
213-680-8400
sharre.lotfollahi@kirkland.com

Garret A. Leach, P.C. *(pro hac vice)*
garret.leach@kirkland.com
Megan M. New *(pro hac vice)*
megan.new@kirkland.com
Nikhil Krishnan (SB 300616)
nikhil.krishnan@kirkland.com
Kyle M. Kantarek *(pro hac vice)*
kyle.kantarek@kirkland.com
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
312-862-2000

*Counsel for Plaintiff Impact Engine, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true copy of the foregoing document has been served on March 4, 2020 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any other counsel of record will be served by electronic mail, facsimile, and/or overnight delivery.

DATED: March 4, 2020                    KIRKLAND & ELLIS LLP


By: */s/ Garret A. Leach*
       Garret A. Leach


*Attorneys for Impact Engine*
*IMPACT ENGINE, INC.,*