*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    David A. Perlson (Ca. Bar No. 209502)
2   davidperlson@quinnemanuel.com
    50 California Street, 22nd Floor
3   San Francisco, California 94111-4788
    Telephone: (415) 875-6600
4   Facsimile: (415) 875-6700

5   David A. Nelson (Ill. Bar No. 6209623)
    davenelson@quinnemanuel.com
6   191 N. Wacker Drive Suite 2700
    Chicago, IL 60606
7   Telephone:  (312) 705-7400
    Facsimile:  (312) 705-7401
8
    PAUL HASTINGS LLP
9   Christopher H. McGrath (Ca. Bar. No. 149129)
    chrismcgrath@paulhastings.com
10  695 Town Center Drive, 17th Floor
    Costa Mesa, CA 92626-1924
11  Telephone: (714) 668-6200
    Facsimile: (714) 979-1921
12
    Attorneys for Defendant,
13  GOOGLE LLC

14              UNITED STATES DISTRICT COURT

15            SOUTHERN DISTRICT OF CALIFORNIA

16  | IMPACT ENGINE, INC., | CASE NO. 19-CV-1301-CAB-DEB |
17  |                      |                             |
    |         Plaintiff,   | **GOOGLE LLC'S MEMORANDUM** |
18  |                      | **OF POINTS AND AUTHORITIES** |
    |         vs.          | **IN SUPPORT OF ITS MOTION** |
19  |                      | **FOR SUMMARY JUDGMENT OF** |
    | GOOGLE LLC,          | **NONINFRINGEMENT** |
20  |                      |                             |
    |         Defendant.   | PER CHAMBERS RULES, NO ORAL |
21  |                      | ARGUMENT UNLESS |
    |                      | SEPARATELY ORDERED BY THE |
22  |                      | COURT |
23  |                      | Hon. Bencivengo, |
    |                      | Courtroom: 1510 |
24  |                      | Hearing Date: TBD[1] |
25  |                      | Complaint Filed: July 15, 2019 |
26
27
    _____
28  [1]   A briefing schedule has already been set by the Court.  Dkt. 300.

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

## TABLE OF CONTENTS

Page

LEGAL STANDARD .................................................................................................. 1

ARGUMENT ............................................................................................................... 2

I.   IE FAILS TO SHOW THAT ANY ACCUSED PRODUCT INCLUDES A PROJECT VIEWER (*'497 CLAIM 9; '6,253 CLAIM 1; '832 CLAIMS 14, 18; '632 CLAIMS 4, 21, 25; '8,253 CLAIMS 1, 7, 12*) ........ 2

    A.   The Court Construes "Project Viewer" as "a specific and limited component part of the system." ....................................................... 3

    B.   IE Improperly Narrows the Court's Required Structure for Project Viewer ......................................................................................... 4

    C.   Dr. Wicker Provides No Infringement Opinion Accounting for the Vast Majority of The Court's Required Structure ........................... 6

    D.   The Remainder of Dr. Wicker's Allegations as to the Project Viewer Are Similarly Infirm. ..................................................................... 9

    E.   Dr. Wicker Provides No Viable Equivalents Theory. ........................ 10

II.  NONE OF THE ACCUSED ADVERTISEMENTS ARE "BROADCAST" (*'632 CLAIMS 4, 21, 25; '8,253 CLAIMS 1, 7, 12; '898 CLAIM 30*) ................................................................................................. 12

III. THE ACCUSED TOOLS DO NOT EMPLOY A COMPILER OR COMPILING ENGINE (*'8,253 CLAIMS 1, 7, 12; '898 CLAIM 30*) ............. 15

IV.  IE FAILS TO RAISE A MATERIAL ISSUE OF FACT AS TO SLIDES, LAYERS, AND CONTENT CONTAINERS. ...................................... 17

    A.   A "Collection of Slides" Cannot Be a Single Slide (*ALL CLAIMS*) .................................................................................................. 18

    B.   None of the Accused Advertisements Include Layers (*ALL CLAIMS*) .................................................................................................. 20

    C.   None of the Accused Advertisements Include Content Containers (*ALL CLAIMS*) ...................................................................... 21

V.   IE DOES NOT SHOW SHOPPING ADS MEET EVERY ELEMENT OF ANY ASSERTED CLAIM (*ALL CLAIMS*) ................................................. 22

VI.  CLAIM 30 OF THE '898 PATENT IS INVALID FOR LACK OF ENABLEMENT AND WRITTEN DESCRIPTION ..................................... 24

CONCLUSION ............................................................................................................ 25

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
    811 F.3d 1334 (Fed. Cir. 2016) ...................................................................... 12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .......................................................................................... 1

*Baran v. Med. Device Techs., Inc.*,
    616 F.3d 1309 (Fed. Cir. 2010) ........................................................................ 2

*Biagro W. Sales, Inc. v. Grow More, Inc.*,
    423 F.3d 1296 (Fed. Cir. 2005) ........................................................................ 2

*Gen. Protecht Grp., Inc. v. Int'l Trade Comm'n*,
    619 F.3d 1303 (Fed. Cir. 2010) ........................................................................ 5

*Hutchins v. Zoll Med. Corp.*,
    492 F.3d 1377 (Fed. Cir. 2007) ........................................................................ 1

*Jazz Photo Corp. v. Int'l Trade Comm'n*,
    264 F.3d 1094 (Fed. Cir. 2001) ........................................................................ 2

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005) ...................................................................... 24

*Odetics, Inc. v. Storage Tech. Corp.*,
    185 F.3d 1259 (Fed. Cir. 1999) ........................................................................ 6

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    No. C-05-00334 RMW, 2008 WL 5411564 (N.D. Cal. Dec. 29, 2008) ... 11, 17

*Tokai Corp. v. Easton Enters., Inc.*,
    632 F.3d 1358 (Fed. Cir. 2011) ........................................................................ 1

*White v. Dunbar*,
    119 U.S. 47 (1886) .......................................................................................... 15

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ........................................................................ 2

### **Statutes**

35 U.S.C. § 112 ...................................................................................................... 2

### **Other Authorities**

https://www.merriam-webster.com/dictionary/collection ("group, aggregate") ....... 20

https://www.w3schools.com/html/html_images.asp .............................................. 22

https://www.w3schools.com/xml/xml_xlink.asp .................................................. 22

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

## NOTE ON ASSERTED PATENTS AND CITATIONS

1. References to the patents-in-suit are indicated by column and line number, or by claim number. Unless otherwise noted, all references to the specifications are to the '497 patent, which is attached as Exhibit A. A reference to "3:15," therefore, means column 3, line 15 of the '497 patent. All emphases are added.

2. The asserted patents are referred to herein as identified below and collectively as the "Asserted Patents".

| **Asserted Patents** | **Asserted Claims[2]** |
|---|---|
| U.S. Patent No. 7,870,497 (the '497 patent) | [1], 9 |
| U.S. Patent No. 8,356,253 (the '6,253 patent) | 1 |
| U.S. Patent No. 8,930,832 (the '832 patent) | [1], [12], 14, 18 |
| U.S. Patent No. 9,361,632 (the '632 patent) | [1], [2], 4, [20], 21, 25 |
| U.S. Patent No. 10,068,253 (the '8,253 patent) | 1, [6], 7, 12 |
| U.S. Patent No. 10,572,898 (the '898 patent) | 30 |

3. The Opening Expert Report of Stephen B. Wicker Regarding Infringement and Alleged Non-Infringing Alternatives, submitted on November 5, 2021, is attached as Exhibit B and referred to as "Wicker Rep."

4. The Rebuttal Expert Report of Stephen B. Wicker Regarding Validity and Secondary Considerations of Nonobviousness, submitted on December 17, 2021, is attached as Exhibit C and referred to as "Wicker Reb. Rep."

---

[2] Bracketed claims are not directly asserted or have been ruled invalid, but remain at issue due to asserted dependent claim(s).

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

5.   The January 19, 2022 deposition of Dr. Wicker is attached as Exhibit D and referred to as "Wicker 1/19/22"

6.   The January 21, 2022 deposition of Dr. Wicker is attached as Exhibit E and referred to as "Wicker 1/21/22"

7.   The January 14, 2022 deposition of Dr. Krein is attached as Exhibit F and referred to as "Krein Tr."

8.   The Court's Claim Construction Order, Dkt. 148, is referred to as "CC Order."

9.   The Court's Supplemental Claim Construction Order, Dkt. 205, is referred to as "Supp. CC Order."

10.  The Court's Order on Motion to Dismiss Pursuant to Rule 12(c) for Patent Ineligibility, Dkt. 268, is referred to as "101 Order."

11.  The transcript of the proceedings held on 5/20/21 regarding the parties' motions to strike, Dkt. 210, is referred to as "5/20/21 Tr." All emphases are added.

12.  The transcript of the claim construction proceedings held on 4/28/2021, Dkt. 199, is referred to as "Supp. CC Tr." All emphases are added.

13.  The transcript of the 101 proceedings held on 12/12/2019, Dkt. 42, is referred to as "101 Tr." All emphases are added.

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

Google seeks summary judgment of non-infringement of all asserted claims. Through its expert Dr. Wicker, Impact Engine ("IE") interprets the claims in a manner that the Court already rejected in construing the terms "project viewer," "broadcast," "communication," and "compiler / compiling engine." Further, IE advances theories of infringement regarding the "slides," "layers," and "containers" limitations that contradict both the Court's rulings and IE's representations to this Court. As there is no genuine issue of material fact that Google does not infringe any of the claims as the Court has construed them, Google respectfully seeks summary judgment of noninfringement. Additionally, summary judgment is appropriate as to IE's "Shopping Ads" allegations because IE fails to raise a genuine issue of material fact as to whether Shopping Ads meets every element of the asserted claims, whether as part of an actually accused ad creation tool (Shopping Ads is not) or otherwise. Finally, and as the Court previously observed, claim 30 of the '898 patent is invalid for lack of enablement and written description, as the specification does not disclose or teach implementing layered slides with content containers using a compiler.

## LEGAL STANDARD

"Summary judgment is as available in patent cases as in other areas of litigation." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011) (citation omitted). Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Id.* at 248. "If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). It is axiomatic that if the accused products fail to satisfy even a single limitation of the claims, they do not infringe. *Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1380 (Fed. Cir. 2007); *Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296,

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

1301 (Fed. Cir. 2005). The party asserting patent infringement has the burden of proving infringement, and thus the burden of establishing that each and every limitation in the asserted claim is met. *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1102 (Fed. Cir. 2001).

## **ARGUMENT**

**I.     IE FAILS TO SHOW THAT ANY ACCUSED PRODUCT INCLUDES A PROJECT VIEWER** (*'497 CLAIM 9; '6,253 CLAIM 1; '832 CLAIMS 14, 18; '632 CLAIMS 4, 21, 25; '8,253 CLAIMS 1, 7, 12*)

As a matter of law, "in order to prove literal infringement of a means-plus-function claim, the plaintiff must show that the accused device performs the recited function ***through structure that is the same as or equivalent to the corresponding structure set forth in the specification***. 35 U.S.C. § 112, ¶ 6." *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316–17 (Fed. Cir. 2010) (emph. added). That claims are limited to the disclosure in the specification is the point of means-plus-function claiming:

> In enacting [35 U.S.C. § 112, para. 6], Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, ***by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof***.

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (emph. added). Because, as in IE's Infringement Contentions,[3] Dr. Wicker provides no mapping of the Court's actual structure to the accused products, summary judgment is appropriate as to all claims containing a "project viewer."

---

[3]   *See* Dkt. 237 (Motion for Summary Judgment of Noninfringement) (withdrawn); 5/20/21 Tr., 5:4-6 (IE would not be able to establish infringement at trial if IE fails to show that the accused products meet the project viewer in its contentions, because "you're not going to be able to go beyond those contentions.")

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

**A.    The Court Construes "Project Viewer" as "a specific and limited component part of the system."**

During the April 28, 2021 claim construction hearing, the Court observed:

> **[P]roject viewer renders, serializes, creates the slides** in the order that all these things are going to happen in and then transmits [it] back to the viewer to see. But **the steps of the rendering are huge. It's not just putting a picture up. It's doing everything that creates the picture. There is nothing else in the patent that describes that function**, who does that function, who renders, who actually assembles, what aspect of the invention actually does that, **other than the project viewer**? And you can't just say all it is is to display it.

Supp. CC Tr. at 17:6-15 (emph. added). "The claims and the specification describe the patents' Project Viewer limitation as **much more than an application to display a file** created by another application" as it must also "render or serialize the communication project slides **and provide them with functionality as described by the patents**." Supp. CC Order at 5-6 (emph. added). The Court thus determined that "the claim term Project Viewer in the context of these patents is a non-structural place-holder identified only by its functions and is therefore subject to a means-plus-function analysis." *Id.* at 6.

The Court found "[t]he structures disclosed to perform the functions of the Project Viewer are described at Col. 4:27 through Col. 9:19, and the Project Viewer is limited to those disclosed structures and their equivalents." *Id.*; Supp. CC Tr., 21:14-19 ("it's a 112.6 issue here. And I think that it starts with column 4 at line 27 [] and then goes on to explain through columns 5, 6, 7 and 8 how it [project viewer] renders and uses those components and wraps up somewhere around column 9 at line 16.") The Court stated, "my construction of Project Viewer [] I think seriously narrows the scope of the plaintiff's patents." 5/20/21 Tr., 3:14-21. "There's all kinds of structures listed here. It's just going to be rather confining." Supp. CC Tr., 40:8-10. And in its § 101 Order, the Court again noted the importance of the project viewer:

> **The Court construed the limitation of the "project viewer" to be a specific and limited component part of the system**. Consequently,

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

claims that contain the project viewer limitation, which discloses a mechanism for creating communications that can be easily edited and distributed on the Internet, are distinguished from the claims at issue in Google's present motion. ***Without that limitation*, these claims broadly encompass collecting user preference information and making an advertisement to be distributed on the Internet using known conventional computer software and hardware**.

101 Order, 9 n.6 (emph. added); Supp. CC Tr., 14:14-24; 18:4-12; 20:12-21:4.

## B.   IE Improperly Narrows the Court's Required Structure for Project Viewer.

Rather than provide an infringement theory for the Court's required structure in Col. 4:27-9:19, through its expert Dr. Wicker, IE purports to separate that structure into nine high-level categories. Wicker Rep., ¶¶ 250-251; Wicker 1/19/22, 72:13-17. For each of these categories, Dr. Wicker recasts the structure actually disclosed into a high level functional description that does not come close to capturing the structure.

For example, Dr. Wicker lumps the vast majority of the structure required by the Court's construction of "project viewer" in category (7), which he characterizes as "embodiments of the project object structure defining layout (*e.g.*, positioning of content, asset width and height) and content (*e.g.*, asset paths or data feeds), including embodiments made up of flash and xml files." Wicker Rep. ¶ 251. This "category" comprises columns 5:7-8:59, almost four columns of structure that is ***over 80%*** of the Court's required structure for project viewer. Dr. Wicker's other categories, and their corresponding portions from the specification, are as follows:

- "(1) receiving a project object as input, the project object containing information necessary for rendering," which corresponds to the two sentences at 4:30-34.

- "(2) loading and interpreting the project object," which corresponds to the first half of the sentence at 4:35-38.

- "(3) determining a load sequence for the communication project," which corresponds to the second half of the sentence at 4:35-38.

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

- "(4) loading the content for playback," which is not recited in the specification and appears to be a generalization of the two sentences at 4:43-46.

- "(5) placing the software into an auto-play on or auto-play off state based on parameters contained in the project object," which Dr. Wicker opines corresponds to 4:49-48 of the specification and which generalizes the functions performed in that paragraph.

- "(6) an interface for communication between components of the communication," which Dr. Wicker opines corresponds to 4:49 through 5:6 of the specification and which again generalizes the functions in that paragraph.

- "(8) providing standalone software for live viewing" and

- "(9) embedding software in the project builder interface," which together Dr. Wicker opines correspond to 8:60 through 9:29 of the specification, but which actually correspond to half of a sentence at 9:1-3: "One of the project viewers is provided for live playback of the communication project, while the other is embedded within the communication project builder…"

*Id.* ¶¶ 250-251. The Court required the specific structure recited in the specification. That IE and Dr. Wicker compare the accused products to something else alone warrants summary judgment. *Gen. Protecht Grp., Inc. v. Int'l Trade Comm'n*, 619 F.3d 1303, 1312 (Fed. Cir. 2010).

Not only does Dr. Wicker inappropriately gut the Court's required project viewer structure with his creation of high-level functional categories, Dr. Wicker opines that only *some* of that structure must be met for each claim. Wicker Rep. ¶¶ 253-54, 295-96, 324, 347, 379, 419; Wicker 1/19/22, 70:19-71:23. For example, Dr. Wicker decided that *99.8%* of the Court's required structure is not required for claim 1 of the '832 patent and claim 1 of the '632 patent, for which he says only his categories (8) or (9) are required. Wicker Rep. ¶¶ 324, 347, 542, 563, 771, 794. For the remaining claims, Dr. Wicker narrows the required structure as follows:

- <u>'497 patent, claim 9</u>: requires only his categories (1), (2), (3), and (8) or (9). *Id.* ¶¶ 252-254.

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

- ____'6,253 patent, claim 1___: requires only his categories (1), (2), (3), and (5). *Id.* ¶¶ 294-296, 498-500, 733-734.

- ____'8,253 patent, claims 1 and 12___: requires only his categories (1), (2), and (8) or (9). *Id.* ¶¶ 379, 419, 593, 629, 819, 837.

By virtue of this parsing, Dr. Wicker incredibly opines that the category with 80% of the Court's structure, category 7, is not required by ***any*** asserted claim. He also opines that his categories 4 and 6 are not required for ***any*** claim. Of course, none of this ignoring of the required structure comes from or is consistent with the Court's claim construction.

### C.   Dr. Wicker Provides No Infringement Opinion Accounting for the Vast Majority of The Court's Required Structure

As noted above, IE's "category 7" recites numerous functions, properties, components and files in nearly four columns of text. 5:7-8:59. This voluminous structure includes the design files "background.fla"(5:18-37), "foreground.fla" (5:38-57), "intro.fla" (5:58 to 6:6), "slideTypen.fla" (6:7-23), and "nav.fla" (6:24-60) and their corresponding native functions. The structure also includes the "Image Component" (7:10-34), "Video Component" (7:35 to 8:6), "Text Component" (8:7-39), and "Custom Component" (8:40-59) and their listed properties. Thus, in order to provide a theory of infringement, Dr. Wicker needed to show where the structure comprising these objects and components or its equivalent is found in the accused products. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267–68 (Fed. Cir. 1999). Perhaps because he asserts, as noted above, that category (7) is not even required for ***any*** asserted claim, Dr. Wicker includes only a ***single paragraph*** in his expert report for each of "Google Ads",[4] Ad Canvas, and YouTube Video Builder for all of category (7). *Id.* ¶¶ 287, 520, 754; Wicker 1/19/22, 120:1-18; 120:25-122:23.

---

[4]   Rather than provide separate infringement allegations as the Court ordered, Dr. Wicker improperly lumped his allegations for Display Ad Builder, Responsive Display Ads, and Lightbox Ads, along with a number of other products, into a single section he termed "Google Ads." *See* Google's concurrently filed Motion to Strike.

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

1   Dr. Wicker does not even try to account for the ***actual*** voluminous portion of the

2   structure in the specification he assigns to this category in the accused products.

3       For example, as to Google Ads, he generally contends that "the preview

4   rendering pipeline utilizes one or more data structures for the project object that

5   defines layout (*e.g.*, positioning of content, asset width and height) and content (*e.g.*,

6   asset paths or data feeds)" and that "the data structures representing the project include

7   layer information," followed by a few general cites. Wicker Rep. ¶ 287*; see also*

8   Wicker 1/19/22, 122:20-23 ("there are one or more data structures for the project

9   object that defines layout and content and so that lines it up exactly with step 7, as

10   I've just described in the earlier paragraph"). But the disclosures in Col. 5:7-8:59 do

11   not just recite using ***any*** data structures or layers: they describe a ***specific*** set of data

12   structures and layers and their functions. *See supra*. Dr. Wicker's infringement report

13   lacks any evidence or allegation that the Accused Products contain ***any*** of this portion

14   of the structure or its equivalent. Instead, at most, Dr. Wicker seeks to compare the

15   accused products to his extremely shorthanded ***characterization*** of category 7.

16       Dr. Wicker took the same approach with other portions of the structure he

17   unilaterally decided were not required by the Court's construction of "project viewer"

18   for any claim. Dr. Wicker's functional category (6) is supposed to correspond with

19   4:59 to 5:6, which includes a "Slide Layer Interface," which provides "the conduit for

20   the exchange of information and/or commands between the different design layers, or

21   between the project viewer itself and a specific design layer," and which "allows the

22   direct use of AS 1.0 [Macromedia ActionScript 1.0] as the command language."

23   Indeed, the Court highlighted these elements in explaining the importance of the

24   rendering performed by the project viewer. Supp. CC Tr. at 27:8-24. ("And there is

25   even a section at the bottom of column 4 where it talks about the project viewer being

26   a conduit, it can be an exchange of information and commands between the different

27   design layers or between the project viewer itself, and ***a specific layer referred to***

28

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

1  *herein as the capitalized Slide Layer Interface. This is now a coined term in your*

2  *patent.*") (emph. added).

3      Yet, Dr. Wicker again did not discuss these components in his report. Wicker

4  Rep. ¶ 286; Wicker 1/19/22, 123:9-11. For example, Dr. Wicker admitted he did not

5  see any use of Macromedia A.S. 1.0 in Google's source code at all. Wicker 1/19/22,

6  90:2-13. Rather, again, the entirety of his infringement allegations consist of a

7  sentence with a few string cites:

8      With respect to step (6), the preview rendering pipeline provides an
       interface for communication between components of the
9      communication.

10

11

12

13

14

15  Wicker Rep. ¶ 286; *see also id.* at ¶¶ 519, 753 (reciting similar allegations for Ad

16  Canvas and YouTube Video Builder). Dr. Wicker does not even attempt to show what

17  in the Accused Products provides the conduit for the exchange of information and/or

18  commands between a design layer and another design layer or the project viewer

19  itself, as the Court specifically highlighted. Supp. CC Tr. at 27:8-24.

20      Similarly, the portion of the structure in Dr. Wicker's category (4) (4:43-49)

21  actually requires loading content in the specific design layers recited in Dr. Wicker's

22  category (7), and loading the "container components" also recited in Dr. Wicker's

23  category (7) with each corresponding layer. *Id.* Yet, here too, Dr. Wicker does not

24  even discuss these files and functions. Wicker Rep. ¶¶ 284, 518, 752; Wicker 1/19/22,

25  122:24-123:5. Instead, Dr. Wicker parrots his shorthand "category" (4) of "loading

26  the content for playback" in a single "example" sentence, with a string cite as he does

27  for "Google Ads" below:

28

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

With respect to step (4), for example, the preview rendering pipeline loads the content in the client for playback by passing asset references in an ad data file,

Wicker Rep. ¶ 284. None of this shows *any* structure in the Accused Products that loads design layers in a load sequence, and then loads content into the containers in that layer as the structure in the Court's construction requires.

**D.    The Remainder of Dr. Wicker's Allegations as to the Project Viewer Are Similarly Infirm.**

For categories (1), (2), (3), (5), (8), and (9), even when he deems them required for a given claim (*see* Section I.B, *above*), Dr. Wicker does not disclose where these portions of the Court's required structure is supposedly present. Instead, for these categories too, he purports to map the accused products to his *characterization* of the components contained in his categories. *See, e.g.,* Wicker Rep. ¶¶ 266-273, 280-281.

For example, Dr. Wicker's category (5), 4:50-58, requires a specific algorithm for slide playback:

> In one embodiment, if auto-play is on, the project viewer determines the duration property of the current slide. If the value of that property is greater than zero, the project viewer waits for that value in seconds before automatically advancing to the next available slide in the communication project. If the value of that property equals zero, the slide viewer stops on the slide until the user navigates to a different slide. If auto-play is off, users must use the slide navigation controls to view a different slide.

*Id*. Dr. Wicker does not even contend that any of the accused products, per the recited algorithm, "wait[] for the value" of a "duration property of the current slide" "before automatically advancing to the next available slide," or stop on a slide if the "duration property" for that slide is zero. Wicker Rep. ¶¶ 300, 510, 743. He instead only purports

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

to conclude that the accused products meet his incomplete characterization of the structure, "placing the software into an auto-play on or auto-play off state based on parameters contained in the project object." *Id.*

Similarly, Dr. Wicker characterizes his categories (8) and (9), which he says cover Col. 8, line 60 to Col. 9, line 28, as requiring "providing standalone software for live viewing" or "embedding software in the project builder interface." *Id.* ¶ 251. This characterization at most only corresponds to Col. 9, lines 1-3: "One of the project viewers is provided for live playback of the communication project, while the other is embedded within the communication project builder…" The remaining sentences of the Court's structure further require, among other things, that the project viewer "open and render these files in a layered manner so that the content 'stacks' according to the layer on which it is located" (8:61-64) and that the "core files [] support two states: a playback state and an edit state" which are "designated within each core file by a frame label." 9:10-12. Yet, once again, Dr. Wicker provides no evidence or opinion that any of Google's accused products actually contain this structure. Instead, Dr. Wicker again purports to show at most his incomplete characterizations of these categories are met. Wicker Rep. ¶¶ 278-281, 324, 347, 542, 563, 772, 795.

**E.    Dr. Wicker Provides No Viable Equivalents Theory.[5]**

Dr. Wicker does not even provide a structural equivalent or DOE assertion for his categories (4) and (6), which he improperly characterizes as "loading the content for playback" instead of the actual algorithm for doing so, and "an interface for communication between components of the communication" instead of the actual structure for doing so, respectively. *Id.* ¶¶ 284, 286, 518-19, 752-53.

Dr. Wicker's boilerplate equivalents statement for category (7) does not raise any genuine issue of material fact either. The entirety of his equivalents allegation for

---

[5]    Dr. Wicker's improper boilerplate doctrine of equivalents arguments should be stricken. *See* Google's concurrently filed Motion to Strike.

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

nearly four columns in his category (7) is only the following:

> To the extent this is not the same structure as disclosed in the specification, it is equivalent. For example, there is an insubstantial difference between █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████

*Id.* ¶¶ 287, 520, 753. Dr. Wicker does not assert that the "result" of using the supposedly equivalent structure is the same, much less which specific structure within the Accused Products is supposedly equivalent to the voluminous structure recited in the specification. *Rambus Inc. v. Hynix Semiconductor Inc.*, No. C-05-00334 RMW, 2008 WL 5411564, at *3 (N.D. Cal. Dec. 29, 2008) (granting summary judgment of noninfringement as to plaintiff's doctrine of equivalents "boilerplate reservation" because "[t]he doctrine of equivalents exists to prevent 'a fraud on the patent.' It is not designed to give a patentee a second shot at proving infringement '[t]o the extent that any limitation is found to be not literally present.'") (citation omitted).

Dr. Wicker's equivalents assertions for his remaining categories are similarly infirm. For instance, for "Google Ads" and "DV360," not YouTube Video Builder, Dr. Wicker asserts that "there is an insubstantial difference between ███████████ ████████████████████████████████████████████████████████ ████████████████████ without providing any allegation that the "result" or "function" (to the extent IE purports to offer a DoE theory) is substantially the same. Wicker Rep. ¶¶ 300, 511. And for his categories (8) and (9), Dr. Wicker asserts that "provid[ing] a standalone preview frame" and ████████████████████ ████████████████████ is substantially the same without even referring to the requirement that, *e.g.,* the project viewer "open and render these files in a layered manner so that the content 'stacks' according to the layer on which it is located." 8:61-64; Wicker Rep. ¶¶ 282, 516, 750. Further, to the extent Dr. Wicker offers any doctrine of equivalents arguments at all, those arguments violate the "all elements"

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

rule. Just like Dr. Wicker's non-existent contentions for the majority of the required structure, Dr. Wicker essentially argues that the required structure need not exist at all. "Under the doctrine of equivalents, an infringement theory thus fails if it renders a claim limitation inconsequential or ineffective." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016).

## II.   NONE OF THE ACCUSED ADVERTISEMENTS ARE "BROADCAST" (*'632 CLAIMS 4, 21, 25; '8,253 CLAIMS 1, 7, 12; '898 CLAIM 30*)

The asserted '632, '8,253, and '898 claims require that the generated communication or advertisement be broadcast or targeted broadcast. In distinguishing prior art from the since-dropped '393 patent, the applicants explained that targeted broadcasting "*is different from* the disclosure's [*sic*] of Fenton and Evans which related, at most, to *posting materials on a web page* and waiting for potential viewers to visit to web page" and "*is also different from*, for example *unicasting* the advertisement to a single recipient or and [*sic*] email list (*multiple unicasting*)." '393 File History, 12/20/2016 Amendment (Ex. G) at 9.[6] The Court construed "broadcasting" as "transmitting in a manner capable of being received by two or more recipients." CC Order at 5. In doing so, the Court noted that

> [T]he definition for broadcasting does imply that you're sending something out to be received by one or more people*, and in the context of doing that, *you're not doing it serially, which I think you've acknowledged in your prosecution history*, as well as I didn't really see an argument to say no, you can broadcast by sending things out to a list of people one at a time as long as it's multiple people because that's just serial Unicasting, and that is not what broadcasting is about.

---

[6]   The applicants subsequently argued that an advertisement that "is only configured for being presented to a single user" "cannot be broadcast for mass deployment." '618 File History, 09/20/2019 Response (Ex. H) at 13; *id.* at 26 ("a prefabricated element that includes only static text and graphics, and *which is simply transmitted to a publisher's website for presentation thereof, on a one by one basis" is not broadcasting*, which requires "use of a single template a multiplicity of advertisements may be generated and distributed to several different users *all at the same approximate time*") (emph. added).

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

10/21/20 Hearing Tr. at 53:15-23 (emph. added). The Court further stated it would disagree with "any argument that sending just kind of seriatim to people constitutes broadcasting" (*id*. at 54:3-7), and that "we can revisit expanding the definition if it looks like trying to capture something that is specifically not allowed based on prosecution history, Unicasting." *Id*. at 63:20-24. As Dr. Wicker conceded at deposition, "'[U]nicasting' is a form of addressing in which you direct a transmission to a particular person—to a particular address … [I]n the context of Internet protocol, in which case the address used in the unicast format would be an IP address, a single IP address." 8/13/20 Depo. Tr. (Ex. Q), 50:3-15. IE seeks to recapture exactly that.

It is undisputed that Google's accused advertisements are and were sent using HTTP or HTTPS (a secure version of HTTP). Wicker 1/19/22, 127:14-16; Krein Tr. 119:10-19. HTTP uses a "request for response" model. Wicker Rep. ¶ 76; Wicker 1/19/22, 127:10-21. "HTTP is fundamentally a transaction based system so you send out a request you get a response. That is the way HTTP has been designed to keep it simple." Wicker 1/19/22, 127:17-21; 135:5-12. It is a "point to point communication method." *Id*. at 127:22-24; *see also id*. at 135:13-17, ("Q. And if another user wants to make a request to that same website, it's got to use a different request, and it will receive a different response; right? A. That's right. HTTP uses TCP, which requires that a connection be created that's point to point."). Thus, when Google serves an ad, it transmits that ad to the client that sent the corresponding ad request. Wicker 1/19/22, 127:7-24. The transmission of an ad is not intended for any other recipient, and indeed cannot be received by any other recipient, as it is transmitted to a single device requesting information from the corresponding server which is how HTTP works as noted above. Taking the example of a web browser, Google receives ad requests at its servers, selects ad responses, and individually transmits ad responses to each browser that visits a web page containing a Google ad. Accordingly, Google employs the serial unicasting that the applicants explicitly distinguished.

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

Nevertheless, Dr. Wicker asserts that Google meets the "broadcasting" limitation because "[o]nce the advertisement has been saved and approved for distribution, it can be distributed to any number of recipients satisfying the targeting advertiser's specified targeting criteria." Wicker Rep. ¶ 344; *see also id.* at ¶¶ 561, 791. When asked at his deposition what he meant by broadcasting an ad, he initially said it was "making the ad available to two or more users, customers at a given time," but then said he "misspoke," and said that "I don't mean at a given time. An act of broadcast is making an ad available to two or more users." Wicker 1/19/2022 Depo. 74:16-24. But the Court's construction requires that the specific ***transmission*** of the advertisement to the recipient must be capable of being received by another recipient. It is thus not sufficient that an accused system purportedly "distributes" advertisements to multiple recipients one at a time, as that encompasses exactly what the Court found was ***not*** broadcasting. Rather, as the Court observed, "sending things out to a list of people ***one at a time as long as it's multiple people*** because ***that's just serial Unicasting***, and that is ***not what broadcasting is about***." 10/21/20 Hearing Tr.

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

at 53:15-23 (emph. added). As IE did when prosecuting the '393 patent, when discussing the prior art, Dr. Wicker himself argues that sending content to website visitors cannot be the "broadcasting" of the claims:

> A HTTP request method is then sent to a server using a given URL. If the request is successful, the web server will send the website files back for rendering on a local browser. A website is not broadcast to multiple users at a time, but posted to an individual user who requests information from that page, or the unicasting that this Court stated was specifically ***not*** the claimed broadcasting.

Wicker Reb. Rep., ¶ 492 (emph. in original); *White v. Dunbar*, 119 U.S. 47, 51-52 (1886) (patent claim is not a "nose of wax" to be twisted one way to preserve a patent's validity and another way to catch an alleged infringer). As the accused functionality employs the serial unicasting the Court already found was explicitly exempted from the "broadcasting," summary judgment is appropriate.

## III. THE ACCUSED TOOLS DO NOT EMPLOY A COMPILER OR COMPILING ENGINE (*'8,253 CLAIMS 1, 7, 12; '898 CLAIM 30*)

The Court construed "compiler" and "compiling engine" as "back-end processing of source code into machine or object code." CC Order at 6-7. Through Dr. Wicker, IE is simply reasserting its rejected construction of "compiling." At the January 14, 2021 claim construction hearing, Dr. Wicker acknowledged the difference between IE's rejected "plain and ordinary meaning" that compiling was simply integrating media assets into a finished communication (Dkt. 108, 17-19; Dkt. 116, 9-10) and the Court's ultimate construction of "back-end processing of source code into machine or object code":

> Yes. It's certainly -- and, again, I agree that **reducing or translating source code into object code is *one form* of compilation**. **But people of skill have been using the word "compiler" somewhat more generally** in computer science to mean a change from one form of representation into another potentially **involving integrating** by stripping off feathers, removing portions of files that aren't necessary so you can take the meat of the files **and bring them all together into**

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

**a single format**. So that's an example of compilation of compiling that would not be reducing the source code.

Dkt. 147 at 16:10-19 (emph. added); *see also id*. at 14:10-19.

Yet, IE's rejected construction of "integrating" is how Dr. Wicker is interpreting compiling for infringement. For example, he states that "Google Ads" and Ad Canvas meet the compiler / compiling engine limitation because ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Wicker Rep. ¶¶ 385, 598 (emph. added). At his deposition he repeatedly admitted that he is pointing to a "combination" of various things into an ad as the alleged compiling. Wicker 1/19/22, 36:1-37:8, 42:11-16, 114:9-18.[7] And for YouTube Video Builder, Dr. Wicker argues it meets the "compiler" / "compiling engine" limitation because ████████████ ████████████████████████████████████████████████████████████ Wicker Rep. ¶ 823. But during claim construction, Dr. Wicker opined that the Court's construction of compiler as "to take source code and through a series of steps reduce it to object code that can be run by a processor" was too narrow as it excluded "translators that go from source code to *an intermediate form*" (Dkt. 147 at 14:10-15), the very thing he now says in included in that same construction.

---

[7] While IE's source code expert Dr. Krein did not opine on whether Google met the compiling element, he similarly drew a distinction between the common meaning of source code that the Court found and the alleged "combination" done in Google's accused products. Krein Tr., 183:16-184:2 ("***In computer science as a whole, you know, typically these elements are not considered object code, and I readily recognize that***. Within this unique technology where you have this process by which these things are combined, manipulated, translated, transformed, and all of those kinds of things, it very much looks like what we see when we see object code being produced. It's not being produced like machine code, but again, it looks like other forms of object code. It's just not in binary. So in that sense, yeah, I think that we can view it as being object code. But again, it's within that context of this technology." (emph. added)). And as he conceded at his deposition, Dr. Krein repeatedly used "compile" as a synonym for terms like "combine" in his report. Krein Tr., 144:25-145:5, 160:9-20.

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

1    In actuality, when Google serves ads generated by the Accused Tools, 

4    Wicker 1/19/21, 168:11-19; Krein Tr.,

5    136:3-137:7; Krein Rep. (Ex. L) ¶¶ 275, 289-90, 304, 306, 309-10, 317.

9    .[8] *Id.*

10    Dr. Wicker asserts that Google's HTML5-formatted advertisements are

11    somehow "equivalent" to advertisements generated by a compiler. Wicker Rep. ¶¶

12    394, 607. Dr. Wicker similarly opines that transforming data "from one form to

13    another form that is appropriate for reading, executing, and/or transporting" is

14    somehow equivalent to processing source code into object or machine code. *Id.* at ¶

15    823. These boilerplate assertions are unsupported by any evidence beyond Dr.

16    Wicker's say-so. *Rambus Inc. v. Hynix Semiconductor Inc.*, No. C-05-00334 RMW,

17    2008 WL 5411564, at *3 (N.D. Cal. Dec. 29, 2008).

18    **IV.    IE FAILS TO RAISE A MATERIAL ISSUE OF FACT AS TO SLIDES, LAYERS, AND CONTENT CONTAINERS.**

19    As the Court observed, "I have been told by [IE] previously that this whole way

20    of serializing these ***slides*** and doing them in ***layers*** is an improvement in the art. It's

21    something new. It's kind of -- it allows the stuff to go out and not take up all kinds of

22    bandwidth." Supp. CC Tr. at 18:13-17. Indeed, IE stated that while a single file

23    containing an entire presentation would be enormous and would thus take a long time

24    to "download, important[ly]," the asserted patents "will actually build an ad, but it

---

26    [8]   IE's theory results in absurdities like HTML web pages being both "source

27    code" and "machine code," URL web addresses and JPEG images being "source code," and video and music files being machine or object code. Wicker 1/19/21,

28    36:1-17; 37:18-24; 93:25-94:22; 108:24-109:3; 136:16-22; 167:2-10.

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

builds it in ***layers,*** as you can see here. 101 Tr. at 17:20-24; *id*. at 19:19-20:2; 20:22-25; 10/21/2020 Hearing Tr. at 11:13-22; *id*. at 18:6-8; IE 101 Slides (Ex. I) at 36, 42; *see also* 10/21/2020 Hearing Tr. at 47:22-48:3, 48:15-21. And in denying Google's 101 Motion to Dismiss as to Claim 30 of the '898 patent, the Court specifically pointed to the importance of slides, layers, and content containers to the validity of that claim.

> Nevertheless, ***the claim includes the limitation that the communication is not just a collection of slides***, ***but*** a collection comprised of ***a grouping of design layers, design elements and content containers***. The description of how these layered slides with content containers are created, managed, and populated is disclosed in great detail in the specification. [Id. at Col. 4:1 - Col 9:10] ***This limitation as part of the claim provides inventive concept*** by requiring that the system not just create a customized communication based on user preferences, but create that communication using a particular format, and the patent describes the mechanism to do so.

Dkt. 268, 12:17-24. For infringement, however, IE ignores the Court's constructions and holdings as to these limitations, rendering them essentially meaningless. Summary judgment as to them is appropriate.

## A.    A "Collection of Slides" Cannot Be a Single Slide (*ALL CLAIMS*)

'497 claim 1, '6,253 claim 1, '832 claim 1, and '898 claim 30 recite a communication. And '632 claim 1 and '8,253 claims 1 and 12 require generating an advertisement using a "template." The Court construed "template" as "pre-existing general structures and arrangements of a multimedia communication." Supp. CC Order at 1-2. The Court further construed "communication" as "a collection of slides." CC Order at 4-5. Thus, there is no dispute that all asserted claims require a collection of slides. Supp. CC Tr. at 22:20-23:3; Wicker Rep. ¶ 208.

IE ignores the Court's construction by contending that a "collection of slides" can somehow be a single slide. Wicker Rep. ¶¶ 208, 485, 722; Wicker 1/19/22, 19:14-16. Dr. Wicker opines that "the patent makes clear, and a POSITA would understand,

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

that a 'collection' can comprise one slide.'…." Wicker Rep. ¶ 237. Dr. Wicker further reasons that "Google's assembled rich media communications" can be a collection of slides because "all rich media ads comprise a collection of at least one multi-layered 'card' or frame…." *Id.*; *id.* ¶ 209 ("to the extent 'slides' are interpreted as referring to an electronic image shown at a point in time (*e.g.*, like a slide in PowerPoint), the layouts still satisfy the construction. In particular, the patent makes clear that a collection can comprise just one multi-layered slide, '497 patent at 3:30–33, 3:42–43, and every advertisement comprises at least one frame…").

The Court's construction, however, explicitly requires a "***collection***" and "slide**s**." As it does now, IE previously argued that Google's "collection" construction was incorrect because it required multiple slides. Dkt. 108, 6:11-15 ("But Google's argument is not supported by the intrinsic evidence. For example, the very next sentence that follows states that '[t]he number of slides for any given communication project ***can range from 0 to N***.' '497 patent at 3:30–32. In other words, the specification makes clear that a communication can comprise ***zero*** slides."); Dkt. 116, 5:23-6:1 ("In fact, the sentence following Google's cited 'definition,' states '[t]he number of slides for any given communication project ***can range from 0 to N***." '497 patent at 3:30–32."). The Court, however, rejected this same argument and adopted Google's construction. CC Order, 4-5; 10/20/2021 Hearing Tr. at 33:22-34:5. Despite IE losing this very issue at claim construction, Dr. Wicker somehow still asserts that a collection can mean "one," pointing to the same two sentences in the specification: "A communication is a collection of slides. The number of slides for any given communication project can range from 0 to N." Wicker Rep. ¶¶ 208, 485, 722 (*quoting* 3:30–32). IE should not be able to use a claim construction and claim construction argument it already raised and lost.[9]

---

[9]   The Court's ruling was clearly correct. The common-sense meaning of "collection" is a group, *i.e.* more than one. *See, e.g.*, https://www.merriam-
(footnote continued)

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

Nevertheless, IE accuses the generation of ads that do ***not*** contain a "collection" of "slide**s**" at all. Rather, Dr. Wicker says ads with single card, frame, or page are a "collection of slides," because there need only be a single slide. Wicker Rep. ¶¶ 237, 302, 313, 466, 470, 495, 522, 702. And at his deposition, Dr. Wicker admitted he did not show an example of an ad with multiple slides for ***any*** of the Accused Tools. Wicker 1/19/22, 19:8-13. Dr. Wicker also provides no theory in his report as to how the videos generated by YouTube Video Builder are somehow a group of slides. Wicker Rep. ¶¶ 723-724, 730, 755. At his deposition he admitted that he had no evidence that videos generated by YouTube Videos have slides other than the fact that they are videos. Wicker 1/21/22, 323:18-22. Yet, he also admitted that the use of a video alone does not mean there is a collection of slides. Wicker 1/19/22, 46:14-18.

Google does not dispute that certain ads created by the Accused Ad Tools may contain multiple slides; specifically, that the Carousel, Cue Card, and Panorama ad types may do so. Thus, Google does not seek summary judgment on the "collection of slides" limitation for the generation of these types of ads by Lightbox and Ad Canvas.[10] But there is no genuine issue of material fact that any other ads created with Accused Tools do not contain multiple slides, and thus summary judgment is appropriate as to the creation of ads by the Accused Tools, other than Carousel Ads, Cue Cards, and Panorama.

## B.    None of the Accused Advertisements Include Layers (***ALL CLAIMS***)

As noted above, all claims require "slides." Wicker Rep. ¶ 208. The Court did

---

webster.com/dictionary/collection ("group, aggregate") (Ex. J). Indeed, Dr. Wicker previously declared that "collection of slides" and "plurality of slides," as used in the claims, have duplicative scopes (Dkt. 87-3, ¶ 42), and that a plurality is "two or more." Wicker 1/19/22, 20:9-15. Every communication in the specification contains more than one slide. Fig. 7 (presentations of 5 pages or up to 25 pages), Provisional (Ex. K) Figs. 12, 17, 18, 22, 24 (presentation with at least 5 pages).

[10]   Google does maintain that the creation of these ads by Lightbox or Ad Canvas do not infringe for other reasons. See *supra* and *infra*.

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

not separately construe "slides," noting it needed no construction. CC Order at 5. But the Court did find "[s]lides are the layers that make up a communication. They consist of the design layers, design elements and content containers. [*Id.*, Col. 3:42-43.] Each layer has certain attributes." *Id.*; *see also* Supp. CC Tr. at 22:20 to 23:3. So while there may not have been a construction of the term "slides," the Court explicitly found that the slides required by every claim consist of "layer**s**."

IE cannot raise a genuine issue of material fact that Google's accused products use multiple layers. Google's accused advertisements are comprised of a single data structure, *e.g.* "an HTML package," that is transmitted to recipients in a single file, in the manner of the prior art. Krein Rep. (Ex. L) ¶ 304. As with slides, despite what the Court found, Dr. Wicker incorrectly asserts that multiple "layer**s**" are somehow not required at all. Wicker 1/21/2022, 298:13-16. Rather, he assumed that a slide can be made up of a single layer. *Id.*, 297:13-15; 344:24-345:1. Thus, Dr. Wicker admitted "I have not distinguished between ads having one layer or multiple layers." Wicker 1/19/22, 129:25-30:4. And unsurprisingly, Dr. Wicker conceded he did not provide a single example of any ads created by the accused tools that have more than one layer. Wicker 1/19/22, 57:8-15. Summary judgment is appropriate.

## C.    None of the Accused Advertisements Include Content Containers (*ALL CLAIMS*)

The Court also found that the slides of the communication must include "content containers." CC Order at 5; *see also* Wicker Rep. ¶ 208. Dr. Wicker testified at his deposition that a "content container" must actually store content. Wicker 1/21/22, 197:15-17. Rather than pointing to any components that actually store content, as to all the Accused Tools, Dr. Wicker instead asserts that "placeholders where user assets will go" and/or "spaces to enter text or images" are the required containers. Wicker Rep. ¶¶ 209, 486, 522, 702, 723, 755, 761. But "placeholders" and "spaces" plainly do not "contain" anything. Rather, they are ***replaced*** by text or references to the filenames of images or videos and do not exist when an ad is served.

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

*See e.g.*, *id.* ¶ 486 (quoting Elterman Dep., 120-121). Indeed, when discussing the prior art, Dr. Wicker testified "A. It's not a content container because it's holding of a filename is metadata. In other words, it's telling you something about what's going to be in there. It's not the content itself." Wicker 1/21/22, 197:9-14. Perhaps realizing that his straightforward, direct answers conflicted with his infringement opinion, in response to a question about layers, Dr. Wicker added "the content container describes where content will go. It exists prior to, as part of the template, prior to the insertion of content. But it is pointing to where content goes, not simply holding the name of content." *Id.* at 198:2-7. That, however, is a distinction without a difference, as the HTML5 or VAST XML used in Google's ads also use filenames "holding the name of content" to incorporate media assets.[11] IE's nose of wax theory should be rejected. *White*, 119 U.S. at 51-52.

## V.   IE DOES NOT SHOW SHOPPING ADS MEET EVERY ELEMENT OF ANY ASSERTED CLAIM (*ALL CLAIMS*)

Throughout his report, Dr. Wicker concludes that Google's Shopping Ads and Showcase Shopping Ads (collectively "Shopping Ads") infringe some or all of the asserted claims. *See, e.g.*, Wicker Rep. ¶¶ 312, 316, 325, 345, 375, 417, 436. He does so without any attempt to identify how every element of the asserted claims are met by Shopping Ads. For that reason alone, as will be discussed more below, there can be no genuine issue of material fact as to Shopping Ads.

At the July 2, 2021 hearing, the Court found that "Impact Engine has identified ad creation tools – the Display Ad Builder, Responsive Display ads, Lightbox, Ad Canvas, and YouTube [Video] Builder" as "using what Impact Engine claims meets all of the limitations of the claim," and that IE "need[s] to go forward with the tools you've identified." Dkt. 231 at 22:4-18. The Court further limited the case to ad types "tied to these tools that you show are used to create them." *Id.* at 24:16-22; *see also*

---

[11]   *See, e.g.,* https://www.w3schools.com/html/html_images.asp (Ex. O); https://www.w3schools.com/xml/xml_xlink.asp (Ex. P).

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

*id*. at 29:23-30:13. Accordingly, any advertisement not created by Display Ad Builder, Responsive Display Ads, Lightbox, Ad Canvas, or YouTube Video Builder is not properly in the case.

Dr. Wicker does not even attempt to show that Shopping Ads are generated by any of the five Accused Tools at issue in this case, in violation of the Court's rulings. *Id.* at 21:20-25:6; 29:23-30:13; Dkt. 210 at 4:25-5:6. Indeed, he admitted at his deposition he did not show an example of any Shopping Ad being created by any of these five Accused Tools. Wicker 1/19/22, 27:1-28:11. Nor could he, as Shopping Ads were not and are not created from any of the five Accused Tools. Schadler Decl. (Ex. M), ¶ 4.

Nor does Dr. Wicker make any effort to show how Shopping Ads meet each and every limitation of any of the Asserted Claims. Instead, in accusing the entire "Google Ads" advertising platform of somehow infringing IE's ad building patents, Dr. Wicker sporadically cites a screen shot of Shopping Ads or just lists them with other types of ads, with no specific discussion of Shopping Ads at all or how it meets any of the elements of the asserted claims. A summary of Dr. Wicker's "evidence" regarding Shopping Ads is attached as Exhibit N. This unexplained smattering of screen shots can hardly create a genuine issue of material fact that every element of the asserted claims is met by Shopping Ads or the tools used to create them. Even the minimal "evidence" Dr. Wicker points to does not show anything about how Shopping Ads operates. For example, Dr. Wicker repeatedly points to webpages created by third-party "FeedArmy," which is not affiliated with Google, and Dr. Wicker has not shown the veracity of the statements in the video. *E.g.*, Wicker Rep. ¶ 220. And IE's source code expert, Dr. Krein, does not discuss how Shopping Ads operates at all.

IE's eleventh hour effort to accuse new products of meeting the claims, and IE's concordant and staggering additional damages claim of ███████████ (Dkt. 272 at 5) for Shopping Ads, should not be condoned. As IE has not and cannot

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

carry its burden to show that either Shopping Ads and Showcase Shopping Ads infringe any of the asserted claims, summary judgment of noninfringement is warranted.

## VI.   CLAIM 30 OF THE '898 PATENT IS INVALID FOR LACK OF ENABLEMENT AND WRITTEN DESCRIPTION

Claim 30 of the '898 patent recites "a compiling engine for integrating the at least one selected media asset with the at least one selected online advertisement template, and for grouping the design layers, design elements, and content containers into the collection of slides so as to generate the communication capable of being rendered in a manner so as to be content specific to the user data, keyword data, and geographic data." As the Court already found, "[t]here is zero information in this patent to explain how a compiler does any of those steps." Supp. CC Tr. 8:19-20. Accordingly, "you've got a claim that's not going to be enabled because there's nothing in the patent that supports a compiler doing those things." *Id.* at 9:2-6. Thus, as the Court already stated, '898 claim 30 is invalid for lack of enablement and also written description. *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345-46 (Fed. Cir. 2005).

IE, through Dr. Wicker, disagrees with the Court's finding. Dr. Wicker contends the Court interpreted '898 patent claim 30 claim wrong. Wicker Reb. Rep., ¶ 1192. Dr. Wicker does not dispute that the compiling engine requires integrating "the at least one selected media asset with the at least one selected online advertisement template," and grouping "the design layers, design elements, and content containers into the collection of slides so as to generate the communication capable of being rendered…" *Id.* at ¶ 1195. Yet, Dr. Wicker identifies no disclosure in the specification where a compiler does these things, showing the Court was correct. Notably, the Court found that the creation, management, and population of "these layered slides with content containers" "provides inventive concept" (101 Order at 12), and Dr. Wicker agrees a "compiler for generating the media asset with

CASE NO. 19-CV-1301-CAB-DEB
GOOGLE'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT

*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL*

the online advertisement template to generate an online advertisement" is "a novel invention." Wicker 1/19/22, 14:6-23. And in arguing that '898 patent claim 30 discloses an inventive step for purposes of 101, Dr. Wicker points to this same functionality that the patents do ***not*** disclose for the compiler: "the claim recites the componentized structure of the communication that achieves these benefits—*i.e.*, a collection of slides comprising a grouping of design layers, design elements and content containers." Wicker Reb. Rep., ¶ 1207.

Nevertheless, Dr. Wicker hand waves as to the lack of disclosure and concludes the compiler and project viewer do essentially the same thing in the specification. *Id.* at ¶ 1192 (citing 12:6–14 and 4:27–32). But the specification is clear that the compiler and project viewer are *not* the same. Fig. 1; *see also* Supp. CC Order at 2-3. At best, Dr. Wicker's citations show only that the compiler and project viewer both have a part in the ad generation and delivery process. *Id*. IE is simply trying to have its cake and eat it too. It avoided invalidity under section 101 by virtue of the limitations in '898 claim 30 that are attributed to the compiling engine. But when faced with the lack of disclosure in the specification of the compiling engine doing what is claimed, IE points to the project viewer. Yet, as the Court has already found, the project viewer is limited to the structures described at Col. 4:27 through Col. 9:19. Supp. CC Order at 6. So, to the extent that IE is saying that the compiler should be interpreted the same as project viewer, then summary judgment of noninfringement is appropriate as to '898 claim 30 as IE has failed to show that any of Google's accused products contain a project viewer. Section I, *supra*. But if the '898 patent is not interpreted to contain the project viewer, it is invalid under 112 for lack of enablement and written description.

## **CONCLUSION**

For the foregoing reasons, Google respectfully asks the Court to grant its Motion for Summary Judgment of Noninfringement as to all asserted claims.

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

1

DATED: February 14, 2022          QUINN EMANUEL URQUHART &
                                  SULLIVAN, LLP

2

3

4                                 By   */s/ David A. Perlson*

5                                      David A. Perlson
                                       Attorneys for Defendant,
6                                      GOOGLE LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28