REDACTED

Sharre Lotfollahi  (SB 258913)
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
213-680-8400
sharre.lotfollahi@kirkland.com

Garret A. Leach (*pro hac vice*)
Nikhil Krishnan (SB 300616)
Kyle M. Kantarek (*pro hac vice*)
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
312-862-2000
garret.leach@kirkland.com
nikhil.krishnan@kirkland.com
kyle.kantarek@kirkland.com

*Attorneys for Impact Engine, Inc.*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPACT ENGINE, INC.,<br><br>            Plaintiff,<br><br>      v.<br><br>GOOGLE LLC,<br><br>            Defendant. | CASE NO. 3:19-cv-01301-CAB-DEB<br><br>**IMPACT ENGINE'S OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Cathy A. Bencivengo<br>Courtroom: 15A |

# **TABLE OF CONTENTS**

I.    Introduction ........................................................................................... 1

II.   Legal Standard ..................................................................................... 1

III.  Argument .............................................................................................. 2

     A.    Google's "Project Viewer" Arguments Fail as a Matter of Law and Raise a Genuine Dispute of Fact .............................................. 2

     B.    Google's "Broadcasting" Arguments Rely on Google's Rejected Claim Construction and Raise Factual Disputes .................................... 10

     C.    Google's "Compiler" Arguments Raise Disputes of Fact ...................... 14

     D.    Google's "Collection of Slides" Arguments Are Unsupported .............. 17

     E.    Google's "Layers" and "Content Container" Arguments Fail ................ 18

     F.    Google's Shopping Ads Arguments Raise Disputes of Fact ................... 21

     G.    Google's Enablement and Written Description Arguments Are Waived, and, in Any Event, Raise Disputes of Fact ................................ 23

IV.  Conclusion .......................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Al-Site Corp. v. VSI Int'l, Inc.*,
174 F.3d 1308 (Fed. Cir. 1999) ............................................................. 7

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......................................................................... 1

*Caterpillar Inc. v. Deere & Co.*,
224 F.3d 1374 (Fed. Cir. 2000) ..................................................... 6, 10

*Cisco Sys. Inc. v. Arista Networks, Inc.*,
2016 WL 4440239 (N.D. Cal. Aug. 23, 2016) ................................. 12

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
880 F.3d 1356 (Fed. Cir. 2018) ..................................................... 12

*Dayco Prod., Inc. v. Total Containment, Inc.*,
258 F.3d 1317 (Fed. Cir. 2001) ..................................................... 19

*Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*,
99 F. App'x 911 (Fed. Cir. 2004) ............................................... 1, 12

*Finjan, Inc. v. Proofpoint, Inc.*,
2015 WL 9460295 (N.D. Cal. Dec. 23, 2015) ................................. 24

*Invitrogen Corp. v. Clontech Lab'ys, Inc.*,
429 F.3d 1052 (Fed. Cir. 2005) ....................................................... 2

*JVW Enterprises, Inc. v. Interact Accessories, Inc.*,
424 F.3d 1324 (Fed. Cir. 2005) ....................................................... 3

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999) ......................................................... 1

*Link Treasure Ltd. v. Baby Trend, Inc.*,
809 F. Supp. 2d 1191 (C.D. Cal. 2011) ........................................... 22

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
2014 WL 690161 (N.D. Cal. Feb. 21, 2014) ................................... 24

REDACTED

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
   194 F.3d 1250 (Fed. Cir. 1999) ....................................................... 3, 4

*NetFuel, Inc. v. Cisco Sys. Inc.*,
   438 F. Supp. 3d 1031 (N.D. Cal. 2020)................................................. 12

*Northrop Grumman Corp. v. Intel Corp.*,
   325 F.3d 1346 (Fed. Cir. 2003) ................................................................ 4

*In re Omeprazole Pat. Litig.*,
   84 F. App'x 76 (Fed. Cir. 2003) ............................................................. 19

*Paldo Sign & Display Co. v. Unified Mktg., LLC*,
   2017 WL 951313 (N.D. Ill. Mar. 10, 2017) ........................................... 22

*Rambus Inc. v. Hynix Semiconductor Inc.*,
   2008 WL 5411564 (N.D. Cal. Dec. 29, 2008) ....................................... 17

*Seal-Flex, Inc. v. Athletic Track & Ct. Const.*,
   172 F.3d 836 (Fed. Cir. 1999) ............................................................ 7, 10

*University of Pittsburgh of Commonwealth System of Higher Educ. v.*
   *Varian Medical Systems, Inc.*,
   561 F. App'x 934 (Fed. Cir. 2014) ........................................................ 3, 4

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
   782 F.3d 671 (Fed. Cir. 2015) ..................................................... 1, 2, 25

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
   392 F.3d 1325 (Fed. Cir. 2004) ............................................................. 19

*Voice Techs. Grp., Inc. v. VMC Sys., Inc.*,
   164 F.3d 605 (Fed. Cir. 1999) ...................................................... 1, 11, 14

*Wi-LAN USA, Inc. v. Ericsson, Inc.*,
   675 F. App'x 984 (Fed. Cir. 2017)........................................................... 1

**Other Authorities**

Fed. R. Civ. P. 56(c)(4)................................................................................ 22

Fed. R. Evid. 703 ......................................................................................... 23

Patent L.R. 3.3(e) ........................................................................................ 24

REDACTED

## NOTES ON CITATIONS

- All emphasis is added unless otherwise noted.

- Exhibits A–F are the exhibits to Google's motion.

- Exhibit 1 is excerpts from the Opening Expert Report of Dr. Stephen B. Wicker Regarding Infringement and Alleged Non-Infringing Alternatives

- Exhibit 2 is a chart summarizing Dr. Wicker's opinions as to which "project viewer" structures correspond to each claimed function.

- Exhibit 3 is excerpts from the Expert Report of Dr. Jonathan Krein Regarding Source Code And Related Matters

- Exhibit 4 is excerpts from the deposition transcript of Google's technical expert on non-infringement, Jacob Wobbrock.

- Exhibit 5 is the Curriculum Vitae for Dr. Jonathan Krein.

- Exhibit 6 is excerpts from the deposition transcript of Dr. Jonathan Krein.

- Exhibit 7 is excerpts from the Expert Report of Dr. Jacob O. Wobbrock Regarding The Noninfringement Of The Asserted Claims in U.S. Patent Nos. 7,860,497; 8,356,253; 8,930,832; 9,361,632; 10,068,253; and 10,572,898.

- Exhibit 8 is excerpts from the deposition transcript of Dr. Stephen B. Wicker on January 19 and 21, 2022.

- Exhibit 9 is excerpts from the Dictionary of Computer Science, Engineering, and Technology, Philip A. Laplante (2001) (IE00047868).

- Exhibit 10 is excerpts from the deposition transcript of Wenchao Tong.

- Exhibit 11 is GOOG-IMPE-00150753 ("Mercer Island RDA Image") (Dep. Ex. 85).

- Exhibit 12 is GOOG-IMPE-00152196 ("Guide to Shopping Ads on Google").

- Exhibit 13 is excerpts from the deposition of Zheng Xia.

- Exhibit 14 is GOOG-IMPE-00056476 ("Dynamic Creatives (DAB, GPA)").

- Exhibit 15 is GOOG-IMPE-00090999 ("Feed Driven Template Ad Design").

- Exhibit 16 is GOOG-IMPE-00122836 ("Lightbox ads Comm Doc").

- Exhibit 17 is excerpts from the deposition transcript of Curt Lawrence.

- Exhibit 18 is a redacted copy of a July 27, 2021 e-mail from Megan New (counsel for Impact Engine) to Andrea Roberts (counsel for Google).

- Exhibit 19 is Google's Response to Impact Engine's Requests For Admission.

- Exhibit 20 is the cover pleading for Google's Supplemental Final Invalidity

REDACTED

Contentions.

- Exhibit 21 is excerpts from the Rebuttal Expert Report of Dr. Stephen B. Wicker Regarding Validity  and Secondary Considerations of Nonobviousness

- Exhibit 22 is excerpts from the Expert Report of Dr. Bernard J. Jansen Regarding The Invalidity Of The Asserted Claims in U.S. Patent Nos. 7,860,497; 8,356,253; 8,930,832; 9,361,632; 10,068,253; 10,565,618; and 10,572,898

## **ACRONYMS**

**DAB:** Display Ad Builder

**DV360:** Display & Video 360

**RDA:** Responsive Display Ads

**YTVB:** YouTube Video Builder

## I.   INTRODUCTION

Google's kitchen sink summary judgment motion should be denied.  Nearly all of Google's non-infringement arguments either misapply the Court's claim construction or apply Google's rejected constructions.  And Google repeatedly asks the Court to decide hotly-contested factual disputes—with competing expert testimony on each side—as to how the claims apply to the accused products.  Such "classic 'battle of the experts'" scenarios "renders summary judgment improper." *Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*, 99 F. App'x 911, 921 (Fed. Cir. 2004).  Google's written description and enablement arguments were never disclosed in its contentions and are thus waived.  Its arguments also misconstrue the Court's comments and Dr. Wicker's testimony, and provide no evidence to support these new theories, nor any analysis under the applicable tests.  Google cannot meet its burden of clear and convincing evidence.  At the very least, genuine issues of fact preclude summary judgment.

## II.   LEGAL STANDARD

"Summary judgment is proper only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Wi-LAN USA, Inc. v. Ericsson, Inc.*, 675 F. App'x 984, 988 (Fed. Cir. 2017). "[A]ll justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

For non-infringement, Google must show that no reasonable jury could conclude that every limitation recited in the properly construed claim is present in the accused device. *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 974 (Fed. Cir. 1999). "[A]pplication of the claims to the accused device, [is] a question of fact." *Voice Techs. Grp., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 612 (Fed. Cir. 1999).

Google must prove lack of written description and enablement "by clear and convincing evidence." *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015).  The written description must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the

REDACTED

filing date." *Id.* at 682.  A claim is enabled if those skilled in the art can "make and use the full scope of the claimed invention without 'undue experimentation.'" *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1070 (Fed. Cir. 2005).  Written description is a question of fact, while enablement is a legal question "based on underlying factual determinations." *Vasudevan*, 782 F.3d at 682–684.

## III.   ARGUMENT

### A.   Google's "Project Viewer" Arguments Fail as a Matter of Law and Raise a Genuine Dispute of Fact

Google levies several flawed non-infringement arguments with respect to the "project viewer"—a term that appears in all but one asserted claims—misapplying the Court's construction and the law, mischaracterizing Dr. Wicker's opinions, and ignoring substantial factual issues that preclude summary judgment.

#### 1.   Google's Assertion of "Required Structure" Misapplies the Court's Construction and Federal Circuit Precedent

Google asserts that Impact Engine improperly "[n]arrows" the Court's "[r]equired [s]tructure" for project viewer limitations and that Dr. Wicker provides "[n]o infringement opinion" for the "[v]ast majority" of that "[r]equired [s]tructure." Memo at 5–9.  Google misstates the Court's construction.  The Court did not set forth any "required structure."  The dispute during the second round of *Markman* proceedings centered on whether the "project viewer" limitations invoked means-plus-function claiming at all, not on the identification of structure for each function.  *See* Doc. No. 178 at 4–5.  The Court determined that the term invokes means-plus-function and then identified four ***distinct*** project viewer functions that are recited across all asserted claims: "**[1]** rendering [serializing] the communication [i.e., collection of slides]; **[2]** displaying slides in auto-play on or auto-play off modes; **[3]** sending the communication to the client computer; **[4]** allowing the user to view templates and media assets." Doc. No. 205 at 6.  The Court did not determine what disclosed structures corresponds to each distinct function.  Instead, the Court identified the full breadth of the disclosed structures for the project viewer—comprising six columns from the patent—without

specifically mapping structures to functions: "[t]he structures disclosed to perform the functions of the Project Viewer are described at Col. 4:27 through Col. 9:19." *Id.*

The Court left it to the parties—and their experts—to determine which of those disclosed structures are **necessary** to perform each claimed function. That is exactly what Impact Engine's expert, Dr. Wicker, did here. He organized the passage identified by the Court into nine algorithmic structures. Ex. B, ¶¶ 250–251. He then identified which structures are necessary to perform each claimed function. *Id.* at ¶¶ 253–254, 296, 379. Google's motion misinterprets the construction as requiring all functions and all disclosed structures for all claims, regardless of the functions actually recited.

Google's approach not only subverts the Court's construction, but is contrary to the law. ***First***, in interpreting every project viewer limitation the same, Google violates a "tenet[]" of claim construction: "a court may not construe a means-plus-function limitation 'by adopting a function different from that explicitly recited in the claim.'" *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1331 (Fed. Cir. 2005) (overruling construction and reversing judgment of non-infringement); *see also* Doc. No. 321-1 (IE's *Daubert* Motion) at 6–9. ***Second***, in assuming that all disclosed project viewer structures are required for all claims, Google ignores that Section 112, ¶ 6 does not permit "incorporation of structure from the written description beyond that **necessary** to perform the **claimed function**." *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). The Federal Circuit's decision in *University of Pittsburgh of Commonwealth System of Higher Educ. v. Varian Medical Systems, Inc.,* 561 F. App'x 934 (Fed. Cir. 2014) illustrates Google's error. There, the district court found the corresponding structure of a means-plus-function limitation was a "two-step algorithm," rejecting the accused infringer's (Varian's) "thirty-step" and "four-step" algorithm constructions. *Id.* at 940. On appeal, Varian criticized the district court for "relying on an introductory sentence in the written description and ignoring the more detailed description of the algorithm in other portions of the patent." *Id.* The Federal Circuit disagreed, affirming the district court's construction:

REDACTED

> Varian's proposed steps further incorporates 'specific embodiments of the invention.' … [W]hile certain conditions may dictate use of the particular implementations identified by Varian in the written description, those implementations ***are not required***. … ***The algorithm need only include what is necessary to perform the claimed function***."

*Id*. at 941.  Google repeats the same mistake here.  The six columns Google imports describe structures that are irrelevant and unnecessary to perform the claimed functions.  For example, the project viewer's algorithm for "auto-play" ('497 patent at 4:50–58) cannot be necessary to the function of "sending the communication to the client computer" (Doc. No. 205 at 6).  Google knows this—it proposed separate structures for each function in *Markman* briefing.  Doc. No. 178 at 4–5.

As in *University of Pittsburgh*, and other Federal Circuit cases, Google's attempt to avoid infringement of through the importation of unnecessary structure (unrelated to the claimed functions) should be rejected.  *E.g.*, *Micro Chem.*, 194 F.3d at 1258 (district court erred "both by incorporating structure beyond that necessary to perform the claimed functions and … unrecited functional limitations"); *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003) ("[f]eatures that do not perform the recited function do not constitute corresponding structure.").

### 2.    A Reasonable Jury Could Find That Google's Systems Satisfy the "Project Viewer" Limitations

Under the appropriate interpretation of the Court's construction, Google infringes.  From the patent columns identified by the Court, Dr. Wicker identified the structures necessary to perform each claimed function, and then analyzed how Google's systems—Google Ads, Display and Video 360 ("DV360"), and YouTube Video Builder ("YTVB")—perform each claimed function using the same or equivalent structures.  *E.g.*, Ex. 1, ¶¶ 249–282 (analyzing Google Ads preview systems for '497 patent, claim 9).[1]  Of the nine parts making up the project viewer disclosure, Dr. Wicker determined that structures 1, 2, 3, 5, and 8 or 9 correspond to perform the claimed

---

[1]    The Google Ads systems generate or generated previews for Display Ad Builder ("DAB"), Responsive Display Ads ("RDA"), and Lightbox Ads, and DV360 systems generate previews for Ad Canvas. Ex. 1, ¶¶ 256–258, 494.

REDACTED

functions.  Exhibit 2 summarizes the specific structure-to-function correspondence.

Google does not dispute that the accused systems perform any of the four claimed project viewer functions nor that they perform the "rendering" function" using corresponding structures 1–3.  *See* Memo at 6–12.  Instead, of the ***necessary*** structures corresponding to the claimed functions, Google only disputes that structures 5, 8, and 9 are satisfied.  *Id*.  Within that narrow sliver, Google raises irrelevant distinctions, mischaracterizes the expert opinions, and exposes significant disputes of material fact.

With respect to structures 8 and 9 Google focuses on two details.  These structures comprise alternative embodiments for software that can receive a rendered preview from the server, and correspond to the functions of "sending the communication to the client computer" and "allowing the user to view templates and media assets."  In response to Dr. Wicker's detailed analysis of how Google's systems performed the claimed functions using structures 8 and 9 or their equivalents  (Ex. 1, ¶¶ 276–282 (Google Ads systems), 512–516 (DV360), 744–750 (YTVB)), Google argues that Dr. Wicker failed to address how Google's systems "open and render [core design files] in a layered manner so that the content 'stacks' according to the layer on which it is located" or include "core files" that "support two states: a playback state and an edit state."  Memo at 10 (quoting '497 patent at 8:61–64 and 9:10–12).  As a threshold issue, Google does not allege that any of these details are necessary to perform either of the claimed functions.  Nor could it—structures for defining a "playback state" and an "edit state," for example, are not required in order to "send[] the communication to the client computer" or "view templates and media assets."  Google also overlooks the opinion and evidence Dr. Wicker provides.  For example, as Google engineer Curt Lawrence explained, ███████████████████████████████████████

███████████████████████████████████████

███████████████████  Ex. 1, ¶ 287 (quoting C. Lawrence) (discussing previews in Google Ads); *see also id*. ¶¶ 520 (discussing previews in Ad Canvas tool).

Google's focus on minutiae unrelated to the claimed functions also overlooks Dr.

REDACTED

Wicker's opinion that Google's systems include equivalent structures to structures 8 and 9.  Dr. Wicker opines that Google Ads' in-editor preview component performs the claimed function using substantially the same way (*e.g.,* ███████████████ ███████████████████) to achieve substantially the same result as in the '497 patent (*e.g.,* ██████████████████████████████████████████ █████████████████████").  *Id*. ¶ 282 (quoting '497 patent at 9:23–28); *see also id*. ¶¶ 516 (discussing infringement by DV360), 750 (discussing infringement by YTVB).  Google argues that Dr. Wicker's equivalents analysis fails to address the content "stack[ing]" detail. Memo at 11. But "the claim limitation is the ***overall structure*** corresponding to the claimed function," and "[t]he individual components, if any, of an overall structure… are ***not claim limitations***." *Caterpillar Inc. v. Deere & Co.*, 224 F.3d 1374, 1380 (Fed. Cir. 2000) (district court "conducted an impermissible component-by-component analysis to determine that no reasonable jury could find structural equivalence").

Google's arguments with respect to the algorithm for "displaying slides in auto-play on or auto-play off modes" (structure 5) are similarly flawed.[2] Dr. Wicker explains that Google's systems, as in the patents, ████████████████████████████ █████████████████████████████████████████ Ex. 1, ¶ 285, 299–300; *see also id*. ¶¶ 511 (discussing DV360), 742–744 (YTVB).  Dr. Wicker also relies on the report of Dr. Krein, who provides additional details on Google's source code, such as ███████████████████████████████████████ ██████████████ *Id*. ¶ 300; *see* Ex. 3, § 6.2.1.1 (¶¶ 63–65).

Google's only response is that Dr. Wicker fails to show that the accused products "'wait[] for the value' of a 'duration property of the current slide' 'before automatically advancing to the next available slide.'"  Memo at 9 (quoting '497 patent at 4:50–58). Google ignores that Google's ████████████████████████████████████████ ██████████████████████ Ex. 3, ¶ 64.  Further, Dr. Wicker explained that,

---

[2]   The "auto-play" function is only required by claim 1 of the '6,253 patent.

although ████████████████████████████████████████, that structure is insubstantially different from the number (timer) parameter of the patent and therefore equivalent.  Ex. 1, ¶ 300.  Google criticizes Dr. Wicker for not specifically alleging that "the 'result' … is substantially the same."  Memo at 11.  But he does exactly that, opining that Google's systems ████████████████████████

████████████████████████████ Ex. 1, ¶ 285; *see id.* ¶ 251 (similarly describing structure 5).  Moreover, "[t]he test for equivalency under § 112, ¶ 6 is whether the accused material is 'insubstantially different' from the material disclosed in the specification," and is not limited to the function-way-result test.  *See Seal-Flex, Inc. v. Athletic Track & Ct. Const.*, 172 F.3d 836, 843 (Fed. Cir. 1999); *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1316 (Fed. Cir. 1999) (similar).

### 3. The Structures for Unclaimed Functions of the Project Viewer, While Irrelevant, Are Nonetheless Present In Google's Systems

The remaining "project viewer" structures disclosed in the passages identified by the Court's construction order describe embodiments for unclaimed functions of loading content in the project viewer (structure 4), enabling communication between components of the communication (6), and organizing content within the communication (7).  Ex. 1, ¶¶ 250–251.  None of these additional structures are ***necessary*** to perform the claimed functions of "rendering," "auto-play," "sending," or "allowing the user to view templates and media assets."  *Id.*, ¶¶ 253–254, 296, 379.  That conclusion is dictated by the narrow construction of "rendering" that Google successfully advocated for, which requires "***serializing*** the project slides and content into a format that can be stored or transmitted," but not actually displaying the project.  Doc. No. 205 at 2; *see* Ex. 1, ¶ 253 ("[S]erialization happens before the communication is … loaded for playback," is "unrelated to … an interface that may exist between components of the communication," and "is a standard process for any network communication that applies to any number of data formats and data structures.").  The project object structure ('497 patent at 5:7–8:59), which is the focus of Google's motion,

REDACTED

is further superfluous in light of the rest of the claim language.  The claims already require a particular communication structure—a "collection of slides" (per the Court's construction of "communication") and, in one claim, "a grouping of design layers, design elements, and content containers" ('6,253 patent, claim 1).

Even if any of these structures were required, Google infringes.  In step 4, the project viewer loads "content in the specific design layer assigned by the end user," in accordance with a "load sequence," before playback of the communication.  '497 patent at 4:43–48.  Dr. Wicker explains that the Google Ads preview systems ███████ █████████████████████████████████████████████████████████████████ ██████████████████████  Ex. 1, ¶ 284.  Google criticizes this analysis as a "single" sentence with a "string cite," ignoring the broader context of the report.  Dr. Wicker's explanation follows several paragraphs in which he explains, with evidence, that in Google's systems ████████████████████████████████████████████████████ ████████████████████████████████████  *Id*. ¶¶ 263; *see also id*. ¶¶ 264, 273 (providing further detail).  Indeed, Google's motion does not challenge Dr. Wicker's opinion that Google's systems include project viewer step 3 ('497 patent at 4:35–38), which involves determining a load sequence for the communication.  *See id*.

Structure 6 is the '497 patent's disclosure of a "Slide Layer Interface," which "provides a conduit for the exchange of information and/or commands."  '497 patent at 4:59–5:6.  Dr. Wicker explained that Google Ads ████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████  Ex. 1, ¶ 286; *see also* ¶ 519 (providing similar evidence for DV360).  Google faults Dr. Wicker for brevity, but a communication interface is a simple concept.

Structure 7 describes an embodiment of the project object data structure.  '497 patent at 5:7–8:59.  It comprises a set of "core design files"—one for each "layer"— each file comprising design information (*e.g.*, "color information") and "container

REDACTED

components," which in turn contains references to content (*e.g.*, image, video assets, or other dynamic content).   *Id.*   The "container components" further include values defining the layer in which the component will appear. *Id.* at 7:32–34, 8:37–39. Despite the length of the passage, the purpose of the disclosed structure is straightforward: conveying information that can be used for rendering the communication project.  Dr. Wicker explained that Google likewise ███████████████████████████████ ███████████████████████████████████. Ex. 1, ¶ 287.  He further detailed that the structure uses █████████████████████████████████████████████ ████████████████████████████████████████████. *Id.* ¶¶ 302–303 (addressing that the "communication is a collection of slides comprising a grouping of design layers, design elements, and content containers"); *see also id.* ¶ 388. And, as Google's own expert admitted, just as the '497 patent's content containers include a "slideLayer" property that "defines the layer in which the component is located" ('497 patent at 7:32–34, 8:37–39), Google ██████████████████████ ████████████████████████████████ Ex. 4 at 25:24–26:7; *see also id.* 131:3–10 (the "slideLayer property" determines which component "would appear on top of" the other); Ex. 1, ¶¶ 287, 302–303.  And just as the '497 patent identifies assets by reference, using a "containerPath" property ('497 patent at 7:30–31), Google uses ████████████████████████████████████████████ ██████ Ex. 4 at 92:13–93:7; *accord* Ex. 1, ¶¶ 273, 388.

While Google's ads do not separate each layer into a different file, Dr. Wicker explained that Google's data structures are equivalent, to the extent those structures for unclaimed functions are required by the Court.  Google Ads, for example, uses ███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ and "there is an insubstantial difference between providing the project viewer with separate design files for each layer of an advertisement and ████████████████████████ ████████████████████████████████████████████ Ex. 1, ¶ 287; *see also*

REDACTED

*id.*, ¶¶ 520 (DV360), 754 (YTVB).  Google reduces Dr. Wicker's opinion into a single sentence, ignoring his substantial analysis of the ad data structures in his report.  *E.g.*, *id.*, ¶¶ 209, 237–239, 302–303.  And, while Google argues that Dr. Wicker "does not assert that the 'result' of using the supposedly equivalent structure is the same" (Memo at 10–11), that is exactly what he did in opining that Google's ad data structures ███████████████████████████████████████████████████████ Ex. 1, ¶ 287; *see also id.* ¶ 251 (project viewer structure 7 discloses a "project object structure defining layout (e.g., positioning of content, asset width and height) and content (e.g., asset paths or data feeds).").  And as noted above, the function-way-result test is not required.  *See Seal-Flex*, 172 F.3d at 843.  Nor was Dr. Wicker required to explain equivalency on a layer-by-layer, "component-by-component" basis.  *Caterpillar*, 224 F.3d at 1380.

## B. Google's "Broadcasting" Arguments Rely on Google's Rejected Claim Construction and Raise Factual Disputes.

The Court construed "broadcasting" as "transmitting in a manner capable of being received by two or more recipients."  Doc. No. 148 at 5.  Google's systems satisfy the "broadcasting" limitation as construed—"[██████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ Ex. 1, ¶ 344; *see also id.* ¶ 561.  Google's arguments go beyond the Court's construction—in essence, importing Google's rejected construction—and raise factual disputes that must go to the jury.

### 1. Google's Attempt to Exclude HTTP-Based Communication Is Unsupported

Google argues its systems cannot perform "broadcasting" because they use HTTP or HTTPS protocol, which uses a "request for response" model with underlying "point to point communication," so "when Google serves an ad, it transmits that ad to the client that sent the corresponding ad request," and that "transmission … is not intended for any other recipient."  Memo at 13.  Google's argument fails.

*First*, Google's motion asks this Court to decide a highly contentious dispute as to what constitutes "transmitting" in the accused products, which is "a question of fact."

*Voice Techs. Grp.*, 164 F.3d at 612.   Both of Impact Engine's technical experts opine that a single broadcast transmission at one level in the software stack may be comprised of multiple point-to-point (*i.e.*, HTTP transactions) at a lower level.   As Dr. Wicker explained, Google's system is designed to transmit the same ad to multiple recipients ███████████████████████████████████████████████████████████████ ██████████████████████████████████████. Ex. 1, ¶¶ 343–344, 561.  Further, as Dr. Wicker opines, an ad can be transmitted "over a period of time."  *Id.*, ¶ 892.  Thus, Google's systems perform "broadcasting" (not unicasting) because they are capable of transmitting the same ad to multiple recipients—regardless of whether that transmission is in response to multiple ad requests coming at the same time or over a period of time, or based on point-to-point connections.  *Id.*, ¶¶ 343–344, 561, 892.

Dr. Krein—who submitted a report on Google's source code—provided his opinion as an expert in computer science and computer networking. Ex. 3, ¶¶ 1–5; Ex. 5.  He explained that communication over a network may be implemented in different ways at different layers of the network and software "technology stack."  *See* Ex. 6 at 114:20–115:20.  Every communication between a client and server over the internet comprises multiple "mini transmissions" at lower levels in the software stack that "***get effectively treated as a single transmission at a higher layer up the stack***."  *Id.* at 124:12–23.  Broadcasting in Google's systems is the same:



*Id.* at 116:11–117:8 (further noting that this is "very similar to things like a [User Datagram Protocol] broadcast"); *see also id*. 116:1–4 (similar).  In other words, the ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████ *Id.* at 124:24–125:10.

Conversely, Google and its expert argue that each HTTP response to an ad

REDACTED

request is a separate transmission.  Memo at 13; Ex. 7, ¶ 299.  This "classic 'battle of the experts' [] renders summary judgment improper." *Edwards*, 99 F. App'x at 921; *see also e.g.*, *NetFuel, Inc. v. Cisco Sys. Inc.*, 438 F. Supp. 3d 1031, 1039 (N.D. Cal. 2020) (denying summary judgment of non-infringement); *Cisco Sys. Inc. v. Arista Networks, Inc.*, 2016 WL 4440239, at \*10 (N.D. Cal. Aug. 23, 2016) (similar).

**Second**, Google's argument is a restatement of its rejected claim construction.  Google argues that "the ***specific transmission*** of the advertisement to the recipient must be capable of being received by another recipient," and that it is "not sufficient" to distribute an advertisement "to multiple recipients ***one at a time***."  Memo at 14.  But Google already unsuccessfully proposed construing broadcasting as "[d]istributing the advertisement to two or more receiving devices ***simultaneously***."  Doc. No. 107 at 14.

**Third**, Google's attempt to exclude all HTTP communication contradicts the patents, which are directed to Internet-based creation and distribution.  *See, e.g.*, '497 patent at 1:30–33 ("This document discloses systems and methods for creating, editing, sharing, and distributing high-quality, media-rich ***web-based*** communications."), 3:6–8 ("The network 106 is preferably the Internet").  Excluding a protocol fundamental to Internet-based communication is contrary to that purpose.  Ex. 1, ¶ 892.[3]  Moreover, disclaimer requires "clearly and unmistakably disavow[ing] a certain meaning in order to obtain the patent." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1367 (Fed. Cir. 2018) (rejecting accused infringer's broad disclaimer argument).  Google offers no evidence that the applicants specifically disclaimed HTTP-based communications, or even point-to-point communication generally.

**Fourth**, Google's attempt to exclude HTTP is based on the incorrect premise that the applicants disclaimed "serial unicasting" and "sending content to a website" during prosecution.  Memo at 13, 15.  But the Court's consideration of the prosecution history

---

[3]   Dr. Wobbrock suggested that other network protocols may satisfy the construction (Ex. 7, ¶ 301), but admitted he has "never used" these protocols and is not "aware of any real-world examples" of their use.  Ex. 4 at 183:2–12.  There is no basis to limit "broadcast" to an esoteric, unused corner case of network-based communications.

REDACTED

is already reflected in its claim construction order, which applies no such disclaimer. Google also misrepresents the prosecution history, which does not clearly and unmistakably disavow sending content to a website or serial unicasting.   During prosecution of the '393 patent, the applicants distinguished "'***targeted*** broadcasting' using keywords of advertisements over the Internet in a plurality of distribution formats," not "broadcasting" generally.   Ex. G at 9.   In that context, the applicants distinguished "posting materials on a web page and waiting for potential viewers to visit."   *Id.*   The applicants did not exclude all forms of sending content to a website from being "broadcasting"—instead, the applicants distinguished presenting the same communication to ***every*** visitor of a webpage from "***targeted*** broadcasting."[4]   *Id.*   And Google's systems do not use the post-and-wait model the applicants distinguished. Instead, users visit webpages with Google ad space, requests sent to Google's servers for an ad, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████.   Ex. 1, ¶¶ 317–320.   The applicants also distinguished "unicasting   the   advertisement   to   a   single   recipient"   and   "email   list   (multiple unicasting)."   Ex. G at 9.   But unicasting and email distribution, alone, do not capture "targeted broadcasting," *e.g.*, "using keywords."   *Id.*   And, the applicants did not mention "serial unicasting" nor clearly disavow all point-to-point communications.

### 2.   Contrary to Google's Argument, the Same Ad May Be Sent to Multiple Recipients

Google   also   incorrectly   argues   that   it   does   not   broadcast   ads   because ██████ ████████████████████████████████████████████████████   Memo at 14.   More specifically Google argues that (1) ████████████████████████████████████████ ████████████████████████████   and (2) ████████████████████████████

---

[4]   Dr.   Wicker   made   the   same   distinction   in   his   expert   report,   which   Google misconstrues as excluding "sending content to website visitors."   *See* Memo at 15. Dr. Wicker clarified during deposition that he distinguishing the provision of an entire "web page," not "ad insertion."   Ex. 8 at 376:9–377:20.

REDACTED

1  ███████████████████████████████████████████ *Id.*

2       These arguments fail.  First, Google attempts to exclude what the claims

3  expressly require—*e.g.*, "**selecting and formatting** the online advertisement in an

4  electronic distribution format based on … data received **from the recipient**" and

5  "performing the targeted broadcasting of the online advertisement … **to the recipient**."

6  *E.g.*, '8,253 patent at claim 1.  The Court did not construe broadcasting in a manner

7  inconsistent with the claims as a whole.  In fact, targeted selecting and formatting is the

8  example of "targeted broadcasting" that the applicants provided during prosecution of

9  the '393 patent.  Ex. G at 9 ("[T]he claims require 'targeted broadcasting' **using**

10  **keywords** of advertisements over the Internet **in a plurality of electronic distribution**

11  **formats**. … Because disparate potential viewers may receive the message (e.g., mobile

12  viewers and viewers on a PC), **a variety of distribution formats is required**.").

13       Second, there is a genuine dispute of material fact as to whether two instances of

14  an advertisement with the **same** template and **same** media assets, but ███████████,

15  comprise the same "online advertisement."  Each of the asserted "broadcasting" claims

16  describe the online advertisement as comprising a "template," and in some claims, one

17  or more "media assets."  *See* '632 patent, claim 1; '8,253 patent, claim 1; '898 patent,

18  claim 30.  None of the claims define the advertisement by its metadata.  Accordingly,

19  Dr. Wicker opined that Google's systems are capable of broadcasting because ████████

20  ████████████████████████████████████████████████████████

21  ████████████████████ Ex. 1, ¶¶ 892–893; *see also id.*, ¶¶ 344 (providing further

22  detail and evidence), 561 (discussing DV360).  Google's expert disagrees, opining that

23  ████████████████████████████████████████████████████████

24  ████████████████████████████████. Ex. 7, ¶ 298.  This

25  cannot be resolved on summary judgment.  *Voice Techs.*, 164 F.3d at 612.

26    **C.**    **Google's "Compiler" Arguments Raise Disputes of Fact**

27       The Court construed the term "compiler" and "compiling engine" as "back-end

28  processing of source code into machine or object code."  Doc. No. 148 at 6–7.  Dr.

REDACTED

Wicker applies that construction, opining that Google's systems satisfy the limitation, either literally or under the doctrine of equivalents, through the ███████████ ████████████████████████████████████████████████. *E.g.*, Ex. 1, ¶¶ 385–395 (Google Ads); ¶¶ 598–607 (DV360), ¶¶ 822–827 (YTVB).[5] Google criticizes Dr. Wicker's opinion as somehow applying a "rejected construction," but disregards the claim language and conspicuously *omits* relevant swaths of his opinion from the excerpts it attached as an exhibit. Ex. B (omitting ¶¶ 386–394, 600–606). Google also reveals factual disputes as to what Google's systems actually do.

First, Google argues that Dr. Wicker is applying a "rejected construction" because he opines that Google's compiler "integrates media assets with templates (specifically, ad layouts) in forming an ad response." Memo at 16 (quoting Ex. B, ¶¶ 385, 598). But Impact Engine proposed that "compiler engine" be given its "[p]lain and ordinary meaning" (Doc. No. 108 at 17)—there is no rejected construction to apply. Moreover, Dr. Wicker was *required* to perform the analysis that Google deems improper—every "compiler" limitation expressly recites "integrating" a "media asset" with an "online advertisement template." '8,253 patent, claims 1, 12; '898 patent, claim 30. Google also overlooks that, *in addition* to explaining how Google's compiler satisfies the express claim requirements (Ex. 1, ¶¶ 385–388, 598–601), Dr. Wicker *also* analyzed how the same component satisfies the Court's construction, either literally or under the doctrine of equivalents. *Id.* ¶¶ 391–394, 604–607, 822–824; *see also id.* ¶¶ 389–390, 602–603 (further detail). For example, Dr. Wicker explains how Google's

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

██████████ *Id.*, ¶¶ 391–393 (quoting Curt Lawrence); *see also id.* ¶¶ 388–390 (further

---

[5] Google Ads and DV360 both use the same back-end system, "BOW," for compiling.

REDACTED

detail).  Google ignores this analysis and fails to meet its burden on summary judgment.

Second, Google argues that Dr. Wicker applies a "rejected construction" in his opinion that YTVB performs compiling by ███████████████████████████ ████████████████████████████ Memo at 16 (quoting Ex. B, ¶ 823).  Google's half-quote is misleading—Dr. Wicker specifically opined that YTVB's █████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ Ex. B, ¶ 823.  Thus, Dr. Wicker did not solely rely on translation into intermediate code.  And, as noted above, Impact Engine's proposal was that no construction was necessary, so there is no "rejected" construction.  Doc. No. 108 at 17.  There is also ample support for Dr. Wicker's opinion that intermediate code in Google's systems is "object code."  *E.g.*, Ex. 1, ¶ 393 (citing Laplante Dictionary); Ex. 9 (Laplante Dictionary) at 47871 ("object code [:] … May also refer to an intermediate representation … which must be processed by a linker and perhaps a loader before it can be executed"); Ex. 6 at 8:6–11 ("object code is some kind of intermediate form of code where it has been processed by a machine to some extent and is intended for another machine to consume in order to cause a computer to perform certain actions").

Third, Google argues that its products do not perform a █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████ Memo at 17.  This not only mischaracterizes Google's systems but raises a factual dispute as to what in Google's systems constitutes "source code" and "machine or object code."  ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████ Ex. 1, ¶¶ 390, 603, 823–825.  Google engineer Wenchao Tong explained that ██████████████████████████████████████████ ████████████ Ex. 10 at 33:14–24; *see* Ex. 1, ¶ 393. █████████████

REDACTED



. *See id*.,

¶ 210 (quoting Curt Lawrence).  But, as Dr. Krein explained,

Ex. 6 at 139:21–141:14.  Thus, while Google

*Id*. at 136:3–138:12.  This transformational process constitutes literal infringement.  *See* Ex. 1, ¶¶ 394, 607, 822.

Lastly, Google attempts to dispose of Dr. Wicker's opinion under the doctrine of equivalents by half-quoting it and then summarily asserting it to be "boilerplate assertions" "unsupported by any evidence beyond Dr. Wicker's say-so."  Memo at 17. In fact, Dr. Wicker applies his own experience in computer science and cites Google's own engineers in support of his substantive analysis. Ex. 1, ¶ 394 (citing Curt Lawrence testimony).   In *Rambus*, Google's only case cite (Memo at 17), the court struck infringement contentions that merely included a "boilerplate reservation," not even a theory.  *Rambus Inc. v. Hynix Semiconductor Inc.*¸ 2008 WL 5411564, at *3 (N.D. Cal. Dec. 29, 2008).  Dr. Wicker's analysis goes far beyond any such generic reservation.

**D.    Google's "Collection of Slides" Arguments Are Unsupported**

All asserted claims require a "collection of slides," either expressly or as a result of the Court's construction of "communication" and "template."   As Dr. Wicker explains, Google's systems produce ads that include a collection of at least one slide. Ex. B, ¶¶ 237, 495, 730.  Certain ad types further comprise multiple slides, as Google acknowledges.  *Id*. ¶¶ 237, 302, 495, 730; Memo at 20.

Google seeks to narrow the Court's construction to require more than one slide. But the patent is clear that a "collection" does not require a plurality of slides:  "A

REDACTED

communication is a collection of slides. ***The number of slides for any given communication project can range from 0 to N***." '497 patent at 3:30–32.[6]  Indeed, "a set or collection of slides" "in computer science" is "zero or more," the same as "a mathematical set." Ex. 6 at 83:20–84:14; *see* Ex. B, ¶ 208 ("a 'collection of slides' can comprise one slide").  Google suggests that Dr. Wicker is applying a rejected claim construction.  But Impact Engine's proposed construction for "communication" never attempted to define "collection."  Doc. No. 108 at 5.  Google is asking the court, yet again, to determine a factual dispute as to how the claims apply to the accused products.

Google's motion also raises a factual dispute as to what in the accused products comprise a "slide."  Google admits that Carousel, Cue Card, and Panorama ads comprise a plurality of slides. Memo at 20.  But Dr. Wicker also opined that Lightbox ads and YTVB ads do as well. *E.g.*, Ex. 1, ¶¶ 302, 495, 730.  Google attempts to discard these opinions by wrongly asserting that Dr. Wicker "did not show an example of an ad with multiple slides." Memo at 20.  Google ignores the evidence he identified. *E.g.*, Ex. 1, ¶¶ 164 (showing Lightbox ads), 302 ("Lightbox / Carousel ads comprise a collection of multiple slides") (screenshots at page 258), 495 ("Cue Cards, Flipbook, Lightbox, and Panorama" include a "plurality of slides") (screenshots on page 505), 730 (YTVB layouts "comprise a collection of slides (*e.g.*, associated with each image or scene in the user's storyboard")) (screenshot on page 740).  Google also ignores Dr. Wicker's testimony that a Lightbox ad—an interactive ad that starts with an "invitation state" and then shows an "expanded state" when clicked—includes "at least two [slides]," and that "Panorama" and "Cuecard" ads include "multiple frames of content," wherein each "frame[] of content is a slide." Ex. 8 at 372:2–376:4.  Google also ignores Dr. Wicker's opinions based on the Court's statement that "[s]lides are the layers that make up a communication." Doc. No. 148 at 5; *see, e.g.*, Ex. 1, ¶ 239.

**E.   Google's "Layers" and "Content Container" Arguments Fail**

Google urged the Court to construe the term "slide" to mean "grouping of design

---

[6]  A project with 0 slides may be one without content.

REDACTED

layers, design elements, and content containers.  The design layers are predefined and remain static." Doc. No. 107 at 12–14.  The Court rejected this construction.  Doc. No. 148 at 5.  Remarkably, Google argues that the Court, somehow, still adopted Google's *rejected* construction because the Court's order mentions the patent embodiments. Memo at 20–21.  Thus, because every claim requires a "collection of slides," Google argues that every claims requires "layers" and "content containers." *Id*.  But, "slides" are given their plain and ordinary meaning, so "layers" and "content containers" are only required where expressly claimed.  *See* Doc. No. 321-1 at 5.  In any event, as discussed further below, Google's ads include both layers and content containers.

### 1.    Google's Ads Include "Layers"

Google argues that the accused products do not "use multiple layers," but instead the "accused advertisements are comprised of a single data structure, *e.g.*, an 'HTML package,' that is transmitted to recipients in a single file, in the manner of the prior art." Memo at 21.  There are numerous problems with Google's argument.

*First*, Google incorrectly assumes that use of the plural "layers" requires multiple layers.  But, "in context, the plural can describe a universe ranging from *one* to some higher number, rather than requiring more than one item." *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004).  Here, use of the plural of "layer," "design element," and "content container" matches the "collection of slides": "a collection of slides comprising a grouping of design layers, design elements, and content containers." '6,253 patent, claim 1; '898 patent, claim 30.  As discussed above and described in the patent, the "collection of slides" may comprise one slide.  It follows that there may be a single design layer, design element, and content container per slide.  *See In re Omeprazole Pat. Litig.*, 84 F. App'x 76, 80 (Fed. Cir. 2003) ("The use of the plural 'materials,' … represents an effort to match the tense of 'layers.'"); *Versa Corp.*, 392 F.3d at 1330 ("[U]se of 'channels' in the plural does not imply that multiple channels are required"); *Dayco Prod., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1328 (Fed. Cir. 2001) ("In the phrase 'projections with recesses therebetween,' the use of 'recesses'

can be understood to mean a single recess where there are only two projections.").

**Second**, contrary to Google's argument, the accused products are capable of producing ads with one or multiple layers.  As Dr. Wicker explained, Google Ads and Ad Canvas— ███████████████████████████████████████████████

███████. Ex. B, ¶¶ 302–303, 486.  As Google's expert admitted, █████████████████

███████████████████████████████████████████████████████ (Ex. 4 at 25:24–26:7), which is the same as the "slideLayer" property in the patents, which "defines the layer in which the component is located."  '497 patent at 7:32–34, 8:37–39.  Google produces ads with multiple layers, *i.e.*, █████████████████.  For example, Exhibit 11 shows an █████████████████████████████████████

█████████████████████.  *See* Ex. B, ¶ 303.  It shows █████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████. Ex. 11 at 150773–150778.[7]

YTVB ads similarly ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████ Ex. B, ¶ 754–755 (excerpting GOOG-IMPE-00088923 and -00010576).

Although Google argues that multiple layers is incompatible with "a single data structure, *e.g.*, 'an HTML package,'" there is nothing in the claims that requires the "grouping of design layers" be conveyed in "separate" data structures.  Instead, Google's use of z-indexes is the same as the patents' use of the "slideLayer" property.[8]

### 2.     Google's Ads Include "Content Containers"

The template, or layout, associated with each Google ad includes "placeholders"

---

[7] Google misrepresents Dr. Wicker as "conced[ing] he did not provide a single example of any ads … that have more than one layer."  Memo at 21.  In the cited testimony, Dr. Wicker states "***I talk in great detail*** in my report about the process by which the Google tools can be used to create such an ad.  ***I don't recall***, for example, giving you a Coke ad or something like that."  Ex. D at 57:8–15.

[8] An ad is not "transmitted to recipients in a single file."  Memo at 21.  Instead, similar to the "containerPath" property used in the patents ('497 patent at 7:30–31), ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Ex. 1, ¶ 388.

REDACTED

that are "instantiated with actual assets . . . at serving time."  Ex. B, ¶ 302 (excerpting GOOG-IMPE-00063404); *see also id*. at ¶¶ 522, 525, 755.  Google argues that such placeholders are not "content containers" because they do not "contain" anything and are simply "replaced by text or references to the filenames of images or videos."  Memo at 21–22.  Google also argues that Dr. Wicker distinguished content containers from metadata that merely "hold[s] the name of content," and suggests that the Google's "placeholders" do the same.  *Id*. at 22.  Google mischaracterizes the products and Dr. Wicker's testimony.  While Dr. Wicker distinguished prior art that disclosed merely "holding a filename" (Ex. E at 197:9–14), he explained that Google's content containers do more: they "describe *where* content will go," in addition to "holding the name of content."  *Id*. at 198:2–7.  This was confirmed by Google's engineers.  *E.g.*, Ex. 1, ¶ 388 (each ad includes "instructions for the browser to lay out the different elements." (quoting Curt Lawrence)), ¶ 486.  This can be seen by the ad example in Exhibit 11, discussed above, which ███████████████████████████████████ ████████████████████████████████████████████  Ex. 11 at 150773.  Google's content containers have exactly the same function as those in the '497 patent embodiments.  *See* '497 patent at 7:27–34 ("Image Component" includes "containerWidth," "containerHeight," "containerPath," and "slideLayer" properties); Ex. 4 at 117–123 (Google's expert testifying to "Image Component" properties).

## F.  Google's Shopping Ads Arguments Raise Disputes of Fact

Google's request to exclude Shopping Ads is without merit.  ***First***, Google argues that the Court limited the case to five "tools"—DAB, RDA, Lightbox, Ad Canvas, and YTVB at a July 2021 hearing—and Impact Engine did not "show that Shopping Ads are generated by" those tools.  Memo at 22–23 (citing Dkt. 231).  This is incorrect.  The Court's comments were made during a hearing on ***Impact Engine's*** motion to compel.  *See* Doc. No. 223.  While the Court did not grant Impact Engine's motion, the Court did not strike any portion of Impact Engine's infringement contentions.  *See id*. at 1–4.

In any event, even if Impact Engine were required to show that Shopping Ads are

REDACTED

generated by the five "tools," there is ample evidence that they do. Google documentation explains that "[s]hopping ads are a visually rich format that show users a photo of your product, plus a title, price, store name, and more." Ex. 12. The product information that populates the ad is pulled from a "data feed" maintained in the "Google Merchant Center" (GMC). *Id*. at 152197. As Dr. Krein found in the source code,

█████████████████████████████████████████████████████████

████████████████████. *See* Ex. 3, ¶¶ 68–72. Numerous other internal documents confirm ████████████████████████████████████████████.[9] And Google engineer Zheng Xia confirmed that, in the current generation of Google Ads,

█████████████████████████████████████████████████████████

██████████████ Ex. 13 at 98:17–99:14, 105:20–107:2; *see* Ex. 1, ¶ 228. Curt Lawrence confirmed that Shopping Ads ███████████████████████████████ ██████████████████████████ Ex. 1, ¶ 258; Ex. 17 at 96:2–9.

   Impact Engine identified this documentation during discovery and asked Google to explain what "tools," if not the "accused" ones, are used to create Shopping Ads. *See* Ex. 18. Google refused. *Id*. Now, Google's only evidence to the contrary is a conclusory declaration from a Mark Schadler. Ex. M. Google's deposed witnesses confirmed that Shopping Ads use the same systems as other accused formats. Meanwhile, Mr. Schadler was neither identified on Google's initial disclosures nor offered for deposition. *See* Doc. No. 321-5. That is a basis to strike his declaration. *Paldo Sign & Display Co. v. Unified Mktg., LLC*, 2017 WL 951313, at *4 (N.D. Ill. Mar. 10, 2017) (striking declaration of witness that was not "made known to plaintiffs during … discovery"). The declaration also fails to show that the "declarant is competent to testify on the matters stated" as required. Fed. R. Civ. P. 56(c)(4). █

█████████████████████████████████████████████████████████

██   Ex. M; *see Link Treasure Ltd. v. Baby Trend, Inc.*, 809 F. Supp. 2d 1191, 1195

---

[9]   *E.g.*, Ex. 14 at 56484 ("Dynamic Visual Shopping" ads in DAB); Ex. 15 at 91003 (similar); Ex. 16 at 122836 (discussing "Ready Lightbox with Shopping format").

REDACTED

(C.D. Cal. 2011) (declaration inadmissible where declarant "does not state her job title, her job responsibilities, or why or how she has knowledge of the facts she asserts").

**Second**, Google argues that Dr. Wicker does not "show how Shopping Ads meet[s] each and every limitation" of the asserted claims. Memo at 23. To the contrary, Dr. Wicker included evidence as relevant—*e.g.*, to show that the Google Ads system provides an interface for accessing Shopping Ads templates (*e.g.*, Ex. 1, ¶ 218), a project builder interface for creating Shopping Ads through the identification of assets (*id*. ¶¶ 220, 228, 235, 242–243), and a project viewer for previewing Shopping Ads (*e.g.*, ¶¶ 258, 261).[10] And, as noted above, Shopping Ads share components with other accused formats and tools. Moreover, as the Court observed in the July 2021 hearing, "[w]hat we're talking about here is a system for building ads," "[n]ot specific ads in and of themselves but the systems for doing it." 7/2/2021 Hearing Tr. at 22.

### G. Google's Enablement and Written Description Arguments Are Waived, and, in Any Event, Raise Disputes of Fact

Google alleges that claim 30 of the '898 patent lacks written description and enablement with respect to "a compiling engine for integrating the at least one selected media asset with the at least one selected online advertisement template, and for grouping the design layers, design elements, and content containers into the collection of slides so as to generate the communication capable of being rendered in a manner so as to be content specific to the user data, keyword data, and geographic data." Memo at 24. Google's purported basis is comments the Court made during the supplemental claim construction hearing. *Id*. Google fails on the merits, but the Court need not address them: Google never disclosed this theory in its invalidity contentions.

The Patent Local Rules require that invalidity contentions must contain "grounds

---

[10]  Google criticizes Dr. Wicker for relying on a video from "FeedArmy" without showing "the veracity of the statements in the video" (Memo at 23), but he relies on the interface captured by the video, not any "statements" made therein. *E.g.*, Ex. 1 at page 126. When asked, Google was unable to identify any inaccuracy in the interface shown, and instead claimed "[in]sufficient information." Ex. 19 at 10. And Dr. Wicker is not limited to considering admissible evidence. Fed. R. Evid. 703.

REDACTED

of invalidity based on lack of written description" and "lack of enabling disclosure". Patent L.R. 3.3(e).  Google served supplemental final invalidity contentions on July 9, 2021, nearly 3 months **after** the April 28 claim construction hearing on which Google bases its motion.  Ex. 20.  Google challenged one limitation from claim 30 of the '898 patent as lacking written description and enablement—requiring that the **advertisement generation engine** "select[], based on one or more of … keyword data, and geographic data" templates and assets.  *Id*. at 36.  Google did not challenge the **"compiling engine"** limitation.  *Id*.  Google has thus waived that challenge.  *E.g.*, *Finjan, Inc. v. Proofpoint, Inc.*, 2015 WL 9460295, at *4 (N.D. Cal. Dec. 23, 2015) (striking undisclosed written description and enablement theories); *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 690161, at *6 (N.D. Cal. Feb. 21, 2014) (same).

Even considering Google's arguments, Google has not met its clear and convincing burden.  Google suggests that the Court found the entire "compiling engine" limitation to not be enabled.  Memo at 24.  Not so.  The Court questioned a sliver of the limitation—the "rendered" aspect:  "[I]t talks about the compiling engine integrating the assets and templates and grouping the design layers and elements and containers into a collection of slides to generate a communication **capable of being rendered**.  But there's nothing in the patent that describes a compiler **rendering in the concept of serializing**."  4/28/21 Supp. CC. Tr. at 7:16–24.  But the limitation only requires that the compiling engine "generate the communication," and that generated communication be "**capable** of being rendered."  Thus, as Dr. Wicker explained, the claim does not "require the compiler to perform that rendering functionality" itself.  Ex. 21, ¶ 1190.

Google also criticizes Dr. Wicker for allegedly not identifying in his report support for the compiling engine "integrating" the media asset with the template and "grouping" "the design layers, design elements, and content containers into the collection of slides."  Memo at 24.  Google has waived these arguments as well.  Dr. Wicker's report was a **rebuttal** report, responding to Google's expert on invalidity, Dr. Jansen.  Dr. Jansen's only opinion was that "[t]here is nothing in the '898 patent that

REDACTED

describes 'a compiling engine' or a 'compiler' ***rendering within the concept of serializing***" or enabling that same aspect. Ex. 22, ¶¶ 1903–1904.

In any event, Google mischaracterizes Dr. Wicker's opinion, which provided support for both "integrating" and "grouping." He explained that the compiler is "described in the specification as taking the communication project as input, and then producing … a communication for distribution and sharing." Ex. 21, ¶ 1192. Dr. Wicker identified Figure 3 and the corresponding description that "the customized ***communication project(s) are received*** from the user ***and compiled into a format suitable for transmission***." *Id*. (quoting '497 patent at 12:6–14). And, as he noted, the patent describes the communication project as comprising "a collection of slides" and a "grouping of design layers, design elements, and content containers." *Id*. (quoting '497 patent 3:30–44). These patent disclosures are adequate and enabling:

> Thus, a POSITA would understand that … the compiler … disclosed in the specification utilize[s] and work[s] with a communication project that is structured as a collection of slides comprising a grouping of design layers (etc.). Further a POSITA would have understood how to implement this functionality in software. Object-oriented concepts, wherein custom data structures are defined using custom data fields and functions, were well-understood in computer science and in popular use with languages such as Java and C++. A POSITA would have understood how to apply those techniques in order to compile the project object described in the '497 Patent without undue experimentation.

*Id*. Google offers no competing evidence under the applicable tests. Notably, for enablement, courts consider ***eight*** factors to determine whether "experimentation is undue"—and Google offers evidence on none. *See Vasudevan*, 782 F.3d at 684 (discussing the *Wands* factors). Where, as here, the patentee's expert "points to specific portions" of the specification, and that opinion "was not challenged by any contrary expert testimony," there is a "genuine issue of material fact." *Id*. at 683-684 (reversing summary judgment for lack of written description and enablement).

## IV.   CONCLUSION

Google's motion for summary judgment must be denied.

REDACTED

DATED:  March 11, 2022

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Garret A. Leach*
Garret A. Leach, P.C.

Attorneys for Plaintiff
IMPACT ENGINE, INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing document has been served on March 11, 2022 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any other counsel of record will be served by electronic mail, facsimile, and/or overnight delivery.

DATED:  March 11, 2022                          By:  */s/* Garret A. Leach

Attorneys for Plaintiff
IMPACT ENGINE, INC.